**UNITED STATES of America, et al.**

v.

**OTTATI & GOSS, et al.**

No. C–80–225–L.

United States District Court,
D. New Hampshire.

Aug. 19, 1988.

---

**1.** The claims of these two shippers totalled over    $48,000.

978

David Hird, Land & Natural Resources Div., Dept. of Justice, Environmental Enforcement, Jon Fleuchaus, U.S. Environmental Protection Agency, Joyce Rechtschaffen, Michael O. Hill, Environmental Enforcement, U.S. Dept. of Justice, Washington, D.C., Jeremy F. Korzenik, Asst. Atty. Gen., Richard V. Weibusch, U.S. Atty., Concord, N.H., Erica Dolgin and William D. Evans, Jr., Land & Natural Resources Div., Dept. of Justice, Sheila D. Jones, U.S. Dept. of Justice, Washington, D.C., for the U.S., et al.

Mark S. Gearreald, Engel, Morse & Gearreald, Exeter, N.H., for Town of Kingston.

David M. Copithorne, Copithorne & Copithorne, Laconia, N.H., for Ottati and Goss, Inc., Ottati and Goss.

Theodore Wadleigh, Wadleigh, Starr, Peters, Dunn & Chiesa, Manchester, N.H., for Great Lakes Container Corp.

John E. Peltonen, Stark & Peltonen, Manchester, N.H., for K.J. Quinn.

Christopher P. Davis, and Paul F. Ware, Goodwin, Proctor & Hoar, Boston, Mass., for Lilly Indus. Coatings, Inc.

James Stewart, Lowenstein, Sandler, Brochin, Kohl & Boylan, Roseland, N.J., for Solvents.

Claudia C. Damon, Sheehan, Phinney, Bass & Green, P.A., Manchester, N.H., for Lewis Chemical Corp.

Paul J. Lambert, Bingham, Dana & Gould, Washington, D.C., for General Electric Co.

Stanley M. Brown, Brown & Nixon, Manchester, N.H., and Howard E. Post, International Minerals & Chemical Corp., Northbrook, Ill., for International Minerals & Chemicals Corp.

Robert P. Cheney, Jr., Asst. Atty. Gen., Environmental Protection Div., Concord, N.H., for State of N.H. intervenor.

Sumner F. Kalman, Plaistow, N.H., and Bracken & Baram, Thomas B. Bracken, Boston, Mass., for Senter Trans. Co., Concord Realty Trust, Bernard Senter and Sally Senter.

Devine, Millimet, Stahl & Branch, Richard C. Nelson, Manchester, N.H., for General Elec. Co., Paint Products Plant.

Guterman, Horvitz, Rubin & Rudman, Stanley H. Rudman, Boston, Mass., for Great Lakes Container Corp.

Hamblett & Kerrigan, PA, John V. Dwyer, Jr., Nashua, N.H., for Solvent Recovery Service of New England.

## TABLE OF CONTENTS *

*Amended Memorandum Opinion, Damages Phase*

| | |
|---|---|
| Cleanup of the IMC Site | 981–983 |
| Ottati & Goss Soil Remedy | 983 |
| Groundwater | 983–985 |
| Groundwater Contamination at Ottati & Goss site | 985 |
| Wetlands Contamination | 985–986 |
| Pump & Treat Method | 986–987 |
| Demolition of the GLCC Building | 987 |
| Kingston Fire Dept. Costs | 987 |
| Mason & Hangar—Silas Mason Co., Inc. Costs | 987 |
| I.T. Corp. Costs | 987 |
| EPA Payroll Costs During Ottati & Goss drum removal | 987–988 |
| Fencing | 988 |
| NUS Corporation | 988 |
| Techlaw | 988–989 |
| GCA Technology Div. Costs | 989 |
| Arthur D. Little, Inc. Costs | 989–990 |
| IT Analytical Services Costs | 990 |
| Ecology & Environment, Inc. | 990–991 |
| Subcontractors Costs Chargeable to GLCC | 991 |
| E & E Costs Chargeable to GLCC | 991–992 |
| Total E & E Costs Chargeable to GLCC | 992 |
| Total E & E Costs Chargeable Ottati & Goss defs. | 992 |
| Viar & Co. Costs | 992 |
| Peabody Clean Industries | 992 |
| Bionetics | 992–993 |
| PRC Environmental Management, Inc. | 993–994 |
| Dept. of Interior Costs | 994 |
| EPA Costs | 994–995 |
| Cooperative Agreement Costs, Goldberg–Zoino & Associates Inc. and State of New Hampshire | 995–997 |
| Dept. of Justice Costs | 997 |
| Prejudgment Interest | 997–998 |
| IMC Equitable Off-Set | 998–1000 |
| Remedy and Future of the Site | 1000 |
| Monitoring | 1000–1001 |
| Standard of Review | 1001 |
| Cost of Groundwater Remedy | 1001–1002 |
| State of N.H. Claims | 1002 |
| Town of Kingston | 1002–1003 |
| Civil Penalty Assessed | 1003 |
| *In Re: Order on Motion to Alter, Amend and Clarify* | |
| EPA's Liability | 1003 |
| IMC Finding 123 | 1003 |
| Dept. of Justice Costs | 1003 |
| EPA Costs | 1003 |
| EPA's Indirect Costs and DOJ Employee Bnfs | 1003–1004 |
| Ruling on Fifty–Fifty Division of Costs | 1004 |
| Calculation of Credits | 1004 |
| NUS Corp. Costs | 1004 |

* Throughout the following opinion defendants Great Lakes Container Corporation (GLCC) and International Minerals Corporation (IMC) in some instances are interchangeable.

Geochem Costs                 1004–1005
Calculation of Interest             1005
*In Re: Order on Money Judg-
ment*
Ottati & Goss Defendants Lia-
bility                             1005
IMC & GLCC Defendants Lia-
bility                             1005
Ottati & Goss Defendants and
IMC Joint Liab.               1005–1006
*In Re: Order on Motion Per-
taining to Future Reponsii-
bilities of the Defendants*
Work to be performed on and
under the Ottati & Goss Por-
tion of the Site                   1006
Work to be performed (GLCC
site and the Marsh)                1006
Extraction System             1006–1007
Treatment System                   1007
Schedule                           1007
Remedial Design/Remedial Ac-
tion Involving Removal and
Disposal of PCB Sediments     1007–1008
Treatability Study                 1008
Rededial    Designs/Remedial
Action Involving Groundwa-
ter                           1008–1009
General Provisions                 1009
Requests                           1009
Conclusion                         1010

## AMENDED MEMORANDUM OPINION, DAMAGES PHASE

LOUGHLIN, District Judge.

This case was bifurcated. The liability phase has ended and is reported in *U.S. v. Ottati & Goss*, 630 F.Supp. 1361 (D.N.H. 1985).

The plaintiffs have settled their cases against the following generators who were defendants in the liability trial: Solvents Recovery Service of New England, Inc., General Electric, K.J. Quinn Co., Lilly Chemical Products, Inc., a/k/a Lilly Industrial Coatings, Inc.

In order to avoid confusion the liability part of the trial is alluded to as Phase 1 and the damage aspect as Phase 2.

After the generator defendants settled with the plaintiffs which was near the end of the Phase 2 trial, the only actual defendant participating in this suit was IMC. There are defendants who either defaulted during Phase 1 or gave up the ghost in Phase 2, namely, Lewis Chemical, Ottati & Goss, Inc., Louis Ottati, Wellington Goss, Senter Transportation Co., Concord Realty Trust, Bernard Senter, Richard French and French Processing Inc.

The opinion in Phase 1 at page 1406 briefly alludes to the fact that both IMC and GLCC attempted to clean up their area of the site. The court held in abeyance any detailed comment on this issue because it was particularly germane to Phase 2.

To briefly recapitulate the findings of the court relative to liability,

The State of New Hampshire under state law procured judgments as follows:

International Minerals & Chemical Corp. (IMC), Great Lakes Container Corp. (GLCC), General Electric Co. (GE), Solvents Recovery Service, Inc. (SRS), Lilly Industrial Coatings, Inc. (Lilly), K.J. Quinn Co., and Lewis Chemical Co. were found liable for nuisance.

IMC and GLCC were found liable for having discharged waste to protected waters of the State in violation of the New Hampshire Water Pollution Contract Act, RSA 149:8, III(a).

GLCC, Lewis Chemical, Bernard Senter, Sally Senter and the Concord Realty Trust were found liable under the New Hampshire Hazardous Waste Management Act, RSA 147–A.

The Town of Kingston is a plaintiff intervenor. The court found the following parties liable to the Selectmen of the Town of Kingston:

Great Lakes Container Corporation, under the Resource Conservation and Recovery Act (RCRA) (for both the Ottati & Goss and GLCC sites), the Clean Water Act (for the GLCC site), and N.H. RSA ch. 147 (for the GLCC site).

Bernard Senter and the Concord Realty Trust under RCRA.

Louis Ottati, Sr., Wellington Goss, Ottati & Goss, Inc., Richard French and French Processing under RCRA and N.H. RSA ch. 147.

With respect to the claims of the United States the court found liable, under both CERCLA and RCRA, 42 U.S.C. § 6973, defendants General Electric, Solvents Recov-

ery Service, Lilly Industrial Coatings, Inc., K.J. Quinn, Lewis Chemical, Ottati & Goss, Inc., Lewis Ottati, Wellington Goss, Senter Transportation Co., Concord Realty Trust, Bernard Senter, Richard French, French Processing, Inc., Great Lakes Container Corp., and International Minerals & Chemical Corp. The court also found defendant GLCC liable for one violation of Section 309 of the Clean Water Act.

With so many issues involved, the court in order to preserve some kind of continuity will attempt to isolate and treat them separately. Some overlapping will be necessary because of the complexity of the issues.

## CLEANUP OF THE IMC SITE

Since the outset of this litigation on May 15, 1980 GLCC and IMC were the only defendants who undertook any remedial action in this case.

IMC sent a petition to this court on April 19, 1984 after IMC and GLCC had settled claims against each other. The petition sought to clean up the 5.88 acres of the GLCC site.

Permission to clean up the premises was granted on May 24, 1984 by the court.

The State of New Hampshire and EPA under the terms of the order had the right to monitor the work being done by IMC during the cleanup period, which commenced in June, 1984, and terminated for all practical purposes in the fall of the same year. Some material had to wait until the early spring of 1985 to be removed.

The cleanup was to proceed with federal RCRA and state RSA 147–A statutes. EPA and the State had on-scene coordinators to monitor the work. They had the privilege of making suggestions and if need be, to seek the aid of the court. They also had the authority if need be, to do their own sampling, check the actual cleanup work and investigate any area they deemed needed it.

The cleanup work revealed that there were many buried drums in the area. Many had been present prior to IMC's own-

ership, going back to Conway and the KSD operations. Some drums were also buried during the IMC tenure, 1973–1976.

The State and EPA both had knowledgeable and competent personnel on-site during the cleanup period. IMC also had its own on site coordinator present.

IMC spent $2,650,028.13 according to its figures cleaning up the site in 1984–85. Design of the job plans, and specifications cost $56,829.38, supervision by its contractor CDM $124,200.15, on site supervision of Guelzow $46,779.64 and SCA was paid $2,442,208.96 for its cleanup contract.

The bid price for the contract was $917,-360.20, but with a cost overrun of $1,524,-848.76.

Reasons for the cost overrun were that more contamination was encountered than expected. Over 3,000 drums were found. It was estimated that not more than 300 drums were there. Most of the drums were found in the so-called Kingston Swamp.

In Phase I, the court found that site conditions on the Ottati & Goss sites have presented an imminent and substantial endangerment, while conditions in Country Pond do not present such an endangerment. *Ottati & Goss*, 630 F.Supp. at 1373, 1385, 1394.

The court did find that high levels of concentrations of hazardous substances were still present.

During the course of the cleanup, suggestions were made and apparently followed. At no time was the work halted or interrupted because of allegations of non-compliance by IMC.

The cleanup included preparation of the decontamination pad, scarification and test pitting. The incinerator was also removed.

TSCA, 15 U.S.C., §§ 2601–2629 et seq. relates to standards with respect to toxic substances. (PCBs) or polychlorinated biphenyls are included. TSCA requires at a minimum that PCB contaminated soils above 50 parts per million (ppm) be incinerated or landfilled. 40 C.F.R. § 761.60(a)(4). This issue was and is a bone of contention between the EPA and IMC. When IMC

commenced its cleanup in 1984 their efforts were to remediate to 50 ppm on the PCBs. Later EPA wanted the standard to be more stringent or 20 ppm. The court rules that the standard in this case is 50 ppm, not 20 ppm.

Procedurally, trenches were dug anywhere from four to ten feet deep. If materials were found, efforts were made to dig at least another foot until the area was cleared or water obviated further digging. The trenches generally were 18 feet in width and were started in the Kingston Swamp area. So-called hot spots were excavated and noxious material was removed. Approximately one-third of the site was excavated. Hot spots were identified by using GPR and magnetometry work. There was also test pitting done.

The cleanup commenced June 26, 1984 and terminated on October 31, 1984.

Contaminated soil was placed on a polyethylene liner to avoid further contamination and was subsequently removed off site. Excavated soil was aerated. The purpose of aerating the soil was to remove the VOCs. Aeration was done by churning; the aerated soil was also trucked in from off-site as a filler. Groundwater levels at times would prohibit any further digging.

HNU meters and magnetometers were used for measurement and safety purposes.

Soils with PCB contamination over 50 ppm were shipped off-site for disposal, soils with less than 50 ppm were aerated, tested and used for backfill.

Approximately 300 plus "full" drums were staged and removed off-site, and approximately 3,500 drums including the full drums, were counted, staged and removed. Additionally approximately 4,000 tons of soils containing PCBs at concentrations of greater than 50 ppm were stockpiled and removed off-site as were approximately 3,000 additional tons of soils excessively contaminated with volatile organic compounds but which did not have PCBs greater than 50 ppm.

Leaking drums were overpacked. Little, if any credence was given by the court to the testimony of Paul Lawrence.

It is true, as this court found in Phase 1, that there were organic contaminants to a depth of 19 feet. The court also found that the GLCC lagoon area condition was exacerbated by conditions at the Ottati & Goss site and the 1982 operation of the crushing pit by EPA. GLCC or its predecessors were far from lily white either as they contributed most of the contaminants.

Subtitle III of RCRA (see also 40 C.F.R. Parts 264 and 265) regulates the management of hazardous waste in order to protect human health and environment.

Reference has been made to RCRA "closure" regulations. 50 Fed.Reg. at 47923. For all practical purposes both the Ottati & Goss and GLCC sites have been closed and non-operative since 1981. Remedying many CERCLA sites is similar to closing a RCRA facility. 50 Fed.Reg. 47923; 40 C.F.R. §§ 264.111, 264.112.

In addition to meeting ARARS, Section 121(b) requires that EPA select a remedy that utilizes permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable. Pursuant to this requirement, EPA must select a remedy that utilizes treatment solutions that will permanently and significantly reduce the toxicity, mobility or volume of the hazardous substances, to the maximum extent practicable. Section 121(b) lists several factors which EPA must consider in evaluating the advantages of permanent remedies rather than interim remedies:

a. the long-term uncertainties associated with land disposal; (§ 121(b)(1)(A))

b. the goals and requirements of RCRA; (§ 121(b)(1)(B))

c. the persistence, toxicity, mobility and propensities to bioaccumulate of the hazardous substances and constituents; (§ 121(b)(1)(C))

d. the short and long term potential for adverse health effects from human exposure; (§ 121(b)(1)(D))

e. long-term maintenance costs; (§ 121(b)(1)(E))

f. the potential for future remedial action costs if the alternative remedial action in question were to fail; (§ 121(b)(1)(F)) and

g. the potential threat to human health and the environment associated with excavation, transportation, and redisposal, or containment. (§ 121(b)(1)(G)).

Section 121(b) apparently has a preference for remedies that use treatment or other approaches to destroy the hazardous substances, requiring that such treatment-based or permanent remedies be used to the maximum extent practicable. 42 U.S.C. § 9621(b); U.S. Exhibit 375 (pp. 31–35, 39); Hohman, Tr. Day 38 pp. 62–63, 68–69.

There is little question that hazardous substances which have been or now are on site are drawn down to whatever level the groundwater may be at that particular time or season. In some instances, substances hazardous or non-hazardous go into the groundwater from the surface and later resurface again, or they may be in sediments.

One of the issues to be decided by the court is whether or not the IMC cleanup of 1984 was efficacious or just an expensive lesson in futility.

Everyone was represented at the cleanup. Suggestions that were made to IMC's supervisors from the evidence presented to this court were acted upon. PCBs for the most part were lowered to the 50 ppm level.

■ There is evidence that the site is not 100% cleaned up (never could be) but the court finds that it is reasonably well cleaned up. It is the further finding of this court that it would be unfair to allow the plaintiffs to change their standards of compliance after IMC has cleaned up within the standards extant when they started to clean up in 1984. The court thus grants IMC's requests numbered 130 and 123. The cleanup meets the standards as to the maximum extent practicable.

The 50 ppm was an acceptable limit in 1984 in this Region. 52 F.Reg. 10688.

GZA conducted studies to evaluate the effectiveness of IMC's cleanup of the 5.88 acres of the GLCC site. Its findings that IMC in its cleanup did not significantly change the high concentrations of VOCs remaining in the soil is not supported by the evidence. While there is evidence in some areas that ppms total of VOC levels exceeded substantially the norm, overall the findings of the court are: the IMC cleanup of the soil contamination substantially cleaned up the VOCs.

### Ottati & Goss Soil Remedy

As part of the settlement by the generators, three of the Ottati & Goss generators, General Electric, SRS, and Lilly have agreed to implement EPA's selected soil remedy for the Ottati & Goss portion of the site, and to contribute towards the cost of the groundwater remedy for the Ottati & Goss portion of the site. These generators have also agreed to reimburse the United States and the State for a portion of their past costs. Due to this settlement, the court has been informed that it need not address the soil remedy for the Ottati & Goss site. Through a separate settlement, K.J. Quinn has agreed to pay a total of $300,000 to the government. As consideration for these commitments by the four defendants, as is reflected above, the United States has agreed to seek to have the remaining portion of the Ottati & Goss groundwater remedy performed by the the Ottati & Goss defendants: GLCC, Lewis Chemical Co., Louis Ottati, Wellington Goss, Ottati & Goss, Inc., Bernard Senter, Senter Transportation Co., Concord Realty Trust, Richard French and French Processing, Inc. IMC, of course, has assumed the liabilities of GLCC.

### Groundwater

The facts relative to the groundwater are quite complex, when considering the remedy proposed.

A concantenation of events evolved around the groundwater controversy. There is the initial dumping of hazardous waste on the Kingston Steel Drum site going back in time to the 1950s. This continued until 1980. In 1979 the Ottati & Goss business venture flowered and shortly withered with dire results. The situation was further exacerbated by the EPA

cleanup of the Ottati & Goss site which dumped more hazardous waste on site, which in time percolated into the groundwater.

Then occurred the merging of the Ottati & Goss and GLCC plumes eventually heading generally eastward under Route 125 towards the marsh. The marsh, a separate entity, is a story in itself. After the litigation ensued, IMC with remarkable foresight had the acumen to purchase the marsh. To some the marsh is considered a savior, to others a temporary holding action. All agree it is a wetlands and a valuable one.

■ The court agrees with the plaintiffs' contention that the court has no jurisdiction to consider a challenge to the listing on the National Priorities List.

Under Section 113(a) of CERCLA, 42 U.S.C. § 9613(a), this court lacks jurisdiction to hear any challenge from the defendants to EPA's decision to select a unified remedy for the Ottati & Goss/GLCC site. Section 113(a) provides:

Review of any regulation promulgated under this Act may be had upon application by any interested person only in the Circuit Court of Appeals of the United States for the District of Columbia. Any such application shall be made within ninety days from the date of promulgation of such regulations. Any matter with respect to which review could have been obtained under this subsection shall not be subject to judicial review, in any civil or criminal proceeding.

In October, 1981, EPA listed the Ottati & Goss/Kingston Steel Drum site as a single site on the National Priorities List (NPL) established under Section 105 of CERCLA, 42 U.S.C. § 9605. See *Tinkham v. Reagan*, 19 Env't Rep.Cas. 1742, 1743 (BNA 1983), No. 83–140–L, slip op. (D.N.H. April 14, 1983); *U.S. Ecology, Inc., v. Carlson*, 21 Env't Rep.Cas. 2009 (BNA 1984), No. 84–3387, slip op. (C.D.Ill. Oct. 3, 1984), dismissed for lack of jurisdiction, 638 F.Supp. 513 (C.D.Ill. 1986); *Eagle-Picher Industries v. EPA*, 759 F.2d 905, 911 (D.C.Cir. 1985).

At the risk of reiteration, the following is excerpted from *Ottati & Goss:*

Groundwater contamination occurs when contaminants are released and enter the groundwater system. Organic contaminants on the land surface go into the unsaturated zone. In time, the contaminants due to precipitation such as rain or snow melt and are washed down through the unsaturated zone and into the saturated zone. On entering the groundwater system, the contaminants will move with it in whichever direction the groundwater is moving.

The entry of chemicals into the groundwater is intermittent. In the saturated zone, the contaminants mix with the groundwater in the aquifer and become dissolved in it.

630 F.Supp. at 1383. New Hampshire has relatively small aquifer systems in comparison to other parts of the country. It does have relatively high water tables.

Under RCRA, EPA is charged with ensuring and protecting the quality of groundwater. Contaminated groundwater which has the potential of being usable or potable must be cleaned up to the greatest extent that is feasible.

The water on the GLCC site has not been used for drinking purposes for the last twenty years or so. It is also very evident that the aquifer in the site area is very important to the Town of Kingston and contiguous or surrounding areas. The so-called southern tier of southern New Hampshire has shown and continues to show a phenomenal growth. With this growth and increase in population is an ever increasing demand for water. Kingston does not have a municipal water supply and is dependent upon dug wells for its water.

47 Fed.Reg. 32283 in essence states: groundwater is a fragile resource and has unique characteristics. It is difficult to clean up a polluted aquifer. There is a priority to clean up contaminated water to its highest potential use. There are three classes of groundwater. Class I groundwater is irreplaceable or ecologically vital. Class II groundwater includes current and

potential sources of drinking water. Class III groundwater is not considered to be a potential source of drinking water because of naturally high salinity or widespread contamination beyond levels that could be cleaned up using methods reasonably employed in treating public water.

[A] response to contaminated groundwater generally would be required to achieve a level of pollutants less than the maximum drinking water contaminant levels established under SDWA, 40 C.F.R. §§ 141.11–141.16 (1986), of the groundwater concentration limits established under RCRA, *id.* § 264.94. *See* 50 Fed.Reg. 47922 (Nov. 20, 1985).
*Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1296 (D.Del.1987).

Levels for arsenic, chromium, lead and nickel found in well 11 all exceed drinking water standards. In all probability well 11 is a background well.

Evidence was adduced that nickel up-gradient of the Ottati & Goss and GLCC site exceeded groundwater standards before the surface water entered the site.

There is no evidence that continuous bedrock users of wells have sustained any risk to their wells. There isn't any evidence that anyone drank contaminated water from either of the sites.

The top four indicator compounds are benzene, tetrachloroethylene, trichloroethylene and 1,2 dichloroethane.

Groundwater should meet drinking water standards including standards for metals.

Groundwater underneath the site is contaminated with pollutants which are in excess of permissible levels. It has to be remediated. The presence of contaminants renders the aquifer and site unusable for future generations until it is cleaned up.

There were drinking wells on site before the water became so contaminated by the operations on the GLCC site and for the short period of time that the Ottati & Goss site was operational.

The groundwater treatment remedy's target goal is 5 ppb for three of the four indicator compounds. They are benzene, trichloroethylene, and 1,2 dichloroethane. The Maximum Contaminant Level (MCL) for these hazardous substances is 5 ppb. 52 Fed.Reg. 25,691, 25,694 (July 8, 1987). These levels are proposed and may not be enforceable.

MCLs are national standards which have been promulgated by EPA pursuant to the Safe Drinking Water Act. 52 Fed.Reg. 25,691, 25,694 (July 8, 1987).

Other hazardous substances present in the groundwater will also be treated to drinking water quality. They include compounds (e.g., acetone and methyl ethyl ketone) phenols, and metals (e.g., arsenic, nickel, iron, and manganese). Of the metals, arsenic will be treated to 50 ppb (an MCL), nickel will be treated to 150 ppm (an EPA Health Advisory, which is a guideline), and iron and manganese will be treated to 300 ppb and 50 ppb, respectively. 40 C.F.R. § 143.3; 40 C.F.R. § 141.11.

It is the court's ruling: the three indicator compounds, benzene, trichloroethylene, and 1,2 dichloroethane shall be remediated to 5 ppb.

## GROUNDWATER CONTAMINATION AT OTTATI & GOSS SITE

1987 sampling shows that the groundwater under the Ottati & Goss site is still contaminated with levels of VOCs above EPA's target goals.

1987 sampling shows the following at the Ottati & Goss site: Trichloroethylene (TCE) is present in the groundwater under the Ottati & Goss site at levels as high as 1,410 ppb, 1,2,dichloroethane at levels as high as 610 ppb, benzene at levels at least as high as 11 ppb, tetrachloroethylene at levels as high as 90 ppb and PCB at levels above 5 ppb. EPA's target goal of 5 ppb must be met for the four indicator compounds: benzene, trichloroethylene (TCE), 1,2,dichloroethane and tetrachloroethylene (PCE).

## WETLANDS CONTAMINATION

1987 sampling rounds show that the groundwater under the marsh or wetlands remains contaminated with levels of VOCs above EPA's target goals.

TCE is present in the groundwater under the wetlands above 5 ppb and in another area at 60 ppb, 1,2 dichloroethylene above 5 ppb and as high as 29 ppb, benzene above 5 ppb and as high as 58 ppb, PCE at levels above 5 ppb and in other areas as high as 447 ppb.

Nickel is present in the wetlands groundwater at levels as high as 380 ppb; arsenic as high as 148 ppb. There is contamination of the peat in the wetlands by the groundwater.

## PUMP AND TREAT METHOD

The pump and treat system proposed assumes a pumping rate of 100 gallons per minute, 60 minutes every hour, 24 hours every day, 365 days every year. Any factor which reduces the pumping rate reduces the anticipated efficacy of the pump and treat alternative in removing TVPPs from the groundwater.

A pump and treat system reduces the overall mass quickly until a time elapses where the overall groundwater concentrations are the same throughout the area of evaluation.

Upon installation greater effects should be seen during the early period of installation.

EPA under Section 121(b) has to select a remedy which significantly and permanently reduces the mobility and the toxicity of hazardous substances to the maximum extent practicable. It has determined that pumping and treating is the manner of achieving this goal. 42 U.S.C. § 9621(b).

The public has expressed an intense interest in EPA's selection of a remedy. The local citizens group, WASTE, has great concerns about the groundwater and its potential use for a drinking water source.

Groundwater contamination will not clean itself up in the near term through natural attentuation.

There would be significant long-term uncertainties associated with natural attenuation. Pumping and treating will clean up the groundwater with more celerity. The goals of RCRA will be considered. PCBs are highly toxic, predisposed to bioaccumu-

late, the VOCs are toxic and motile. There is both a short and long term potential for adverse health effects from human exposure. There is the potential for future remedial action costs if the alternative remedial action were to fail. That is if the court assumed from the evidence that natural attentuation would just as efficiently alleviate the groundwater problem. 42 U.S.C. § 9621(b). The remedial action shall according to 42 U.S.C. § 9621(c) be reviewed no less often than each 5 years after the initiation of such remedial action to insure that human health and the environment are being protected by the remedial action being implemented.

A problem with the pump and treat system which concerns the court is its installation in the marsh area. The marsh area is east of Route 125 and groundwater flows from the site under Route 125 then into the marsh.

The court is in agreement with former Administrator Ruckelshaus' policy statement with regard to the protection of the nation's wetlands. "Wetlands represent an ecosystem of unique and major importance to the citizens of this Nation and, as a result, they require extraordinary protection." 38 Fed.Reg. 10834 (May 2, 1973).

In the court's opinion installing and operating a groundwater pump and treat system in the wetlands or marsh would have an impact on the marsh. The construction of a road is not a feasible alternative. There would be an impact on animal life, vegetation, but more importantly on the submerged peat in the marsh which has the ability to attenuate contaminants.

With some reluctance the court rules as follows: Installation of the wells presents two feasible alternatives. If the wells are installed in the winter time when the ground is frozen, skid mounted bombardier equipment should be used. At any other time the decking system should be used.

The Ottati & Goss plume does, in its travels, deposit contaminants into and under the GLCC site. The defendants found liable for contaminating Ottati & Goss which includes EPA are liable in damages

for EPA's response costs related to the GLCC problems with groundwater. This includes any remediations necessary to clean up the groundwater at the GLCC site.

There was a mixing of the crushing pit plume and the plume from the caustic pit sawdust pile area which increased toxicity. Mixing of groundwater from the two sites began approximately 900 feet west of Route 125 and substantially mixed 400 feet easterly of the 900 feet.

GLCC and IMC are also jointly and severally liable with the aforesaid defendants and the EPA.

Regarding the groundwater on site, IMC did not attempt to clean up the groundwater. Sampling of groundwater in February, 1987 shows that groundwater under the GLCC site remains contaminated with levels which are above EPA's target goals.

EPA's target goals are 5 ppb for each of four indicator hazardous substances: trichloroethylene (TCE), 1,2 dicloroethane, benzene and tetrachloroethylene (PCE).

All indicator compounds concentrations in the groundwater at the GLCC site exceed 5 ppb.

■ To summarize, the defendants are ordered to perform EPA's selected groundwater remedy. It is not arbitrary and capricious. Target goals of EPA shall be met.

### DEMOLITION OF THE GLCC BUILDING

■ There is a cinder block building on the GLCC site which the court has viewed. There is no question that the building or sections of it are contaminated. It has to be demolished. A cost estimate ranging between $57,000 and $74,800 plus 25% has been submitted to the court. The court finds that the costs of demolition of the building is $82,375. This cost is assessed against the GLCC and IMC defendants.

### KINGSTON FIRE DEPARTMENT COSTS

■ The Kingston Fire Department provided emergency services such as a water curtain, neutralization water, ambulance and fire prevention services. This was to aid EPA in February, 1982 in reducing vapor emissions at the Ottati & Goss site during the drum removal operations. EPA spent $1,694.80 according to the terms of a contract that it had with the Kingston Fire Department. These costs are reimbursable.

### MASON & HANGER–SILAS MASON CO. INC. COSTS

Mason & Hanger transported, maintained and operated a mobile laboratory at the Ottati & Goss site during the drum removal. They performed analyses of substances from the drums. Additionally, they conducted background screening for air monitoring.

EPA spent $17,601.83 under and Emergency Environmental Response Unit Contract for these services with Mason & Hanger. These costs are reimbursable.

### I.T. CORPORATION COSTS

I.T. Corporation operated a mobile laboratory at the Ottati & Goss site from October, 1981 through March, 1982 during the drum removal period. EPA paid I.T. $16,334.20 for its labor, materials and expenses which are reimbursable.

### EPA PAYROLL COSTS DURING OTTATI & GOSS DRUM REMOVAL

Reimbursable are EPA payroll expenses of $22,971.39. This is for EPA personnel who worked at the Ottati & Goss site during the drum removal operations. This was during the period from June, 1981 until April, 1982.

Ottati & Goss, Louis Ottati, Richard French and Bernard Senter were given the opportunity to remove contaminated materials from the Ottati & Goss site by August 5, 1979. None of these defendants removed any contaminated materials from the site prior to the EPA drum removal operation.

The generators were not given an opportunity by EPA to undertake the drum re-

moval. This issue is somewhat moot in view of the settlement albeit that it was post trial between the plaintiffs and the generators.

## FENCING

The GLCC site and the IMC marsh shall be fenced. It will be at IMC's expense and shall be a six foot high chain link fence. See exhibit IM–D–182.

If the plaintiffs at their voluntary option deem it feasible, the Ottati & Goss site shall be fenced at their expense. With respect to the easement with Hampton Power & Electric Company, a gate opening can be made and a key given to the power company.

## OTHER RESPONSE COSTS

### NUS Corporation Costs

NUS performed work for the EPA at the Ottati & Goss/GLCC site under the Field Investigation Team (FIT) contract in 1983 and 1984. NUS was paid $35,212.00 by EPA.

Of this amount EPA seeks to charge $12,851.00 solely to the GLCC defendants and $22,361.00 against all defendants.

$1,682.00 was spent by NUS to produce documents for the use of the defendants in this litigation. The costs relate to the Ottati & Goss site and the GLCC site and cannot be divided.

$8,093.00 was charged for Phase 1 testimony. This was with regard to testimony by former Ecology & Environment, Inc. employees for investigative work at both sites. After subtracting the costs relating to the September 9, 1983 incident, the balance shall be divided equally.

$281.00 spent by NUS for disposable protective clothing, providing of air monitoring and arranging for the December 6, 1983 view by the court is chargeable to all defendants.

NUS spent $2,141.00 to oversee work performed by Roy F. Weston on the GLCC 5.88 acres in 1984. $8,973.00 was also spent for NUS to oversee IMC excavation work done at the GLCC site in 1984.

$850.00 was spent by NUS in preparation for a cost recovery report for this litigation.

Many of the NUS employees who had worked on both sites under the Field Investigation Team contract had previously been employed by E & E under a similar contract with EPA.

Difficult as it is, this court rules on the allocation of costs as far as possible. The total sum of $35,212.00 is broken down as follows.

Costs reasonably allocated against GLCC and Ottati & Goss defendants amount to $22,361.00. Dividing that figure by two results in the sum of $11,180.50 being charged against IMC. $12,851.00 is charged solely against the GLCC defendants, for a total sum against the GLCC defendants of $24,031.50. With regard to the $24,031.50 figure, IMC shall be credited with the costs relating to the September 9, 1983 incident as heretofore stated.

## TECHLAW, INC.

Techlaw became involved in the Ottati & Goss cleanup sometime in January, 1983. Its involvement with the sites ended sometime in January, 1984.

The duties of Techlaw pertaining to the cleanup were twofold. It was charged with on-site organization of case files and preparation of evidence profile samples. Techlaw's total cost for work performed was $23,278.10. Techlaw representatives expressed opinions that, at this point in time, it would be nearly impossible to allocate the work which was performed on the Ottati & Goss and the IMC sites.

Although IMC does not specifically dispute the response cost attributable to Techlaw individually, IMC does refute the allocation of all response costs which the government is attempting to levy upon IMC, in which there is no substantiated allotment either as a result of complexity or the government's failure to ensure such allotment.

There is testimony from Duba, the Techlaw representative which indicates that, had Techlaw been informed of the separa-

tion of the Ottati & Goss site from the IMC site, and that both were to be dealt with separately in allotting work charges, such a billable breakdown would have been provided. (Tr. day, 4, p. 41–42).

The actual figures presented by the government concerning Techlaw, are substantiated. The costs are divided equally, $11,639.05 for each site.

## GCA TECHNOLOGY DIVISION, INC. COSTS

EPA spent $233,682.00 for work performed by GCA Technology Division, Inc. (or subcontractors to GZA) under the Technical Enforcement Support Contract from 1983 until 1985.

$65,904.00 according to the EPA is chargeable only to the Ottati & Goss defendants.

$10,273.00 pertained to the case against Geochem for depositing metals. The court has ruled in favor of Geochem and this sum cannot be charged by EPA against any defendant.

$107,472.00 was spent to develop two computer data bases for use by government trial attorneys and experts. The first data base was with reference to the Ottati & Goss site.

GCA billed EPA $120.00 in order to get Roy F. Weston to prepare its cost recovery data for which it charged GCA $3.00.

GCA charged for 38 hours to contact two witnesses to testify in Phase II of the trial. EPA was billed in the approximate sum of $1,600.00. Both witnesses had testified in Phase I.

The bills of Doctors Meyer and Gosselin are reduced from $12,168.00 to $10,568.00. Recovery here is sought by EPA only against Ottati & Goss defendants.

The court finds that one half of the effort concerned the first data base and one half concerned the second data base. With regard to the second data base, it would be difficult to distinguish between sites for the time spent for design, programming, testing and supervising work relating to a particular well.

The sums of $1,708.00 spent for GCA to obtain the services of an expert hydrogeologist for Phase I of the trial is disallowed.

The sum of $337.00 spent for GCA to obtain the services of an expert toxicologist for Phase I of the trial is disallowed. Their work assignments were subsequently cancelled.

$2,625.00 paid to Greg Morley for testimony in Phase I and other GZA personnel to assist in trial preparation is chargeable against all defendants.

$27,142.00 paid to Dr. John Guswa and Geotrans to aid EPA's attorneys in preparation for the testimony of defendants' experts in Phase I of the trial is chargeable against all defendants.

$62,708.00 was spent when Dr. John Guswa was with Roy F. Weston, Inc. He testified as an expert in Phase I of the trial for the plaintiffs and to aid in preparation for the testimony of defendants' experts.

This was testimony pertaining to hydrogeology and contaminant in groundwater and is chargeable against all defendants.

$8,966.00 was spent for GCA to oversee the IMC operation at the GLCC site. This was from July, 1984 until May, 1985.

The sum of $160.00 spent for Ecology & Environment, Inc. to provide cost recovery documentation for work it had performed at the Ottati & Goss/GLCC site is chargeable to all defendants.

Allocation of GCA costs are required. In summary, the total GCA costs chargeable to the Ottati & Goss defendants is $137,489.50. The total GCA costs chargeable to the GLCC defendants is $82,151.50.

## ARTHUR D. LITTLE, INC. COSTS

Arthur D. Little Company was employed by the government to assist in preparation for trial on a variety of issues relating to the Ottati & Goss site and the GLCC site. The employment of A.D. Little consisted primarily of the expertise of Doctors John Guswa and Joan Berkowicz, who collectively authored a report for use in trial preparation by the government. Both individuals provided deposition testimony, while Dr.

Guswa additionally testified during Phase I of the litigation.

The work performed by these individuals as employees of A.D. Little concerned groundwater contamination at both the Ottati & Goss site and the GLCC site. The total charge submitted by A.D. Little for performance of these services amounted to $8,117.67. No effort was made to allocate the cost amongst the sites, however, since the subject of the work performed involved groundwater (its condition and flow patterns) on the Ottati & Goss site, the IMC site, and on the surrounding areas, an attempt to allocate the amount of work performed on the various sites would not be reasonable. The government suggests an equal division of the A.D. Little costs, since the work involved all the parties and concerned groundwater contamination. The court agrees with this allocation.

The total A.D. Little charge shall be divided equally with $4,058.84 attributable to the GLCC site and $4,058.84 attributable to Ottati & Goss.

## IT ANALYTIC SERVICES COSTS

EPA spent $35,284.88 for expert testimony of employees of IT Analytic Services during Phase I of the trial. Chemical analyses were made of groundwater samples taken in May, 1980 from the Ottati & Goss and GLCC properties. They seek to have this sum of money chargeable against all defendants.

IMC had agreed to obviate this expense by stipulating to this evidence. Originally, the government took the position that all costs related solely to the Ottati & Goss site. The generator defendants refused to stipulate and the witnesses had traveled to Concord prepared to testify. The court rules that it would be unjust to penalize IMC under these circumstances. The $35,-284.88 is chargeable against the Ottati & Goss defendants, not the GLCC defendants.

## ECOLOGY & ENVIRONMENT, INC.

The government claims EPA spent $264,-075.52 for work performed by Ecology & Environment, Inc. (hereinafter E & E).

This figure is computed by multiplying the total LOE hours 5,991, by an average labor cost of $40.60 per hour. This work was performed at the Ottati & Goss/GLCC site under the Field Investigation Team Contract. The government claims that, of that total, $13,993.11 is chargeable only to Ottati & Goss defendants and $9,992.58 is chargeable only to GLCC. The remaining $240,129.83, the government contends, is chargeable to both sets of defendants.

The government claims the breakdown for E & E costs is as follows:

a. $5,157.40 was spent for subcontractor Western Geophysical Corp., to conduct subservice investigation through the use of seismic refraction data. This sum is chargeable to both sets of defendants since the work concerned the site as a whole.

b. $1,490.00 was spent for subcontractor Parker Survey Associates, to perform a boundary survey and develop a base map of the site. This sum is chargeable to both sets of defendants since the survey concerned the entire site involving GLCC's 5.88 acres and Ottati & Goss's 1 acre.

c. $800.00 was spent for subcontractor Detection Services Group to perform a ground penetration radar survey. This sum is chargeable to both sets of defendants since the work concerned both properties.

d. $13,270.10 was spent for subcontractor Clarence Welti Assoc., to install 16 monitoring wells at the site. The government contends that since 12 of the 16 wells relate exclusively to GLCC and 4 of the 16 relate exclusively to Ottati & Goss, $9,952.58 is chargeable to the GLCC defendants.

e. $10,675.58 was spent for E & E to perform a magnetometer scan to search for buried metals to the west northwest of the Ottati & Goss property. However, this sum is chargeable only to the Ottati & Goss defendants since the work related solely to the Ottati & Goss site.

f. $187,018.37 was spent for E & E to implement a groundwater investigation and monitoring system. This sum is charge-

able to both sets of defendants since the study included both properties.

g. $9,781.30 was spent for E & E to collect water and sediment samples in the marsh, Country Pond and residences surrounding the pond. This sum is chargeable to both sets of defendants.

h. $35,883.38 was spent for E & E to draft a Remedial Action Master Plan. This was a preliminary assessment which identified the additional work needed to undertake the RI/FS. This sum is chargeable to both sets of defendants since the plan addressed the remedial action for the entire site.

The government further contends that, if allocation of all costs is required, of the $240,129.83 E & E costs chargeable to both sets of defendants $190,049.95 is chargeable to the GLCC defendants.

GLCC, however, contends that E & E spent approximately 25% of their time performing miscellaneous non-site specific tasks. These miscellaneous tasks are attributed to training, equipment maintenance and reviewing technical literature. GLCC claims that this time factor was not allocated to any particular site and may have related to equipment not even used at the site and to reviewing literature unrelated to the site. Taking into account the 1.376 multiplier factor—which increased the LOE hours from 4,354 to 5,991—defendants contend 37.5% of E & E's total charges excluding subcontractors' costs represent miscellaneous costs. Thus, miscellaneous costs equal $91,257.90 ($243,354 × .375).

GLCC further contends that the added-on miscellaneous charge for non-site specific tasks represents time in which E & E was not engaged in TDD's. However, E & E charges the same loaded rate of $40.62 for equipment maintenance as they do for actual field work.

Finally, GLCC contends that the fully-loaded hourly rate for E & E work in 1981 and 1982 was $35.00 per hour. GLCC claims it was adjusted upward to $40.62 in 1984. During testimony, it was revealed that in 1981 when E & E was actually doing the work at the site, its cost analysis indicated that the appropriate rate was approximately $35. per direct labor hour. *See* Tr. 8, p. 101. After reanalyzing its total billings to the EPA two years later, E & E arrived at a different hourly rate of $40.62. E & E claims that the $35.00 rate didn't represent all costs associated with the program.

The court makes the following findings of fact with regard to the E & E costs chargeable to GLCC:

### Subcontractors' Costs Chargeable to GLCC

It is undisputed that the total E & E subcontractor costs are $20,717.50. According to the Welti Well distribution, $9,952.58 is directly attributable to GLCC—this figure represents 12 of the 16 Welti Wells. As for the remaining $7,447.40 subcontractor costs, the court adopts a 50/50 ratio allocation distribution and finds that $3,723.70 is attributable to GLCC. Therefore, total subcontractor costs chargeable to GLCC equals $13,676.28.

### E & E Labor Costs Chargeable to GLCC

In assessing the direct labor costs attributed to both sets of defendants, the court opines that a $35/hour rate accurately reflects the fully-loaded hourly rate chargeable by E & E for work performed in 1981 and 1982. The record as a whole contains insubstantial evidence as to why the hourly rate was raised to $40.62 in 1984.

In applying the 1.376 multiplier factor, E & E expended a total of 5,991 labor of effort hours. The charge attributable to E & E direct labor, therefore, is $209,685.00 ($35/hour × 5991 hours). However, $9,198.35 (262.81 hours × $35/hour, *see* Tr. Day 6, p. 156) was spent for E & E to perform a magnetometer scan which was directly attributable to Ottati & Goss. Therefore, $200,486.65 must be allocated between both sets of defendants according to the court's 50/50 ratio.

In applying the 50/50 ratio, $100,243.32 is directly attributable to GLCC. The court agrees with defendant, GLCC that 37.5% of

E & E's total charges, excluding subcontractors' costs, represent miscellaneous costs which this court refuses to hold chargeable to GLCC. Therefore, $62,652.08 is the appropriate allocation of direct E & E labor costs chargeable to GLCC.

### TOTAL E & E COSTS CHARGEABLE to GLCC

In applying the above numerated totals, the court concludes that the total E & E costs chargeable to GLCC is $76,328.36. This figure is arrived at by adding the $13,676.28 subcontractor costs attributed to GLCC with the $62,652.08 E & E direct labor costs attributed to GLCC.

### Total E & E Costs Chargeable to Ottati & Goss Defendants

Reference is made to pages 33 and 34 of the March 17, 1988 opinion and the following is incorporated. Total E & E subcontractor costs chargeable to the Ottati & Goss defendants equals $3,723.70. $9,198.35 represents magnometer scan costs and is directly attributable to the Ottati & Goss defendants. Finally, E & E direct labor costs of $62,652.08 are assessed against the Ottati & Goss defendants. Thus, $75,574.13 represents total E & E costs chargeable to the Ottati & Goss defendants.

### VIAR AND COMPANY COSTS

EPA spent $75,538.13 for work performed by Viar & Company and National Contract Laboratory Analytical Laboratories under the Sample Management Office Contract from 1981 until 1984. Costs of $9,270.14 are not charged to any defendant because there is insufficient data to conclusively attribute it to the Ottati & Goss/GLCC site.

The plaintiffs seek to charge the Ottati & Goss defendants $11,501.10, the GLCC defendants $25,785.78 and $28,981.11 to all other defendants.

Costs are based on sample "traffic reports" and chain of custody reports indicating the well locations where samples were taken.

Of the total cost of the Viar contract to EPA of $75,538.13, $67,984.39 was analytical work and $7,553.73 was sample management costs.

Metals analyses were conducted by Versar and Rocky Mountain Analytical Laboratories. The total cost of metals analysis is $9,059.99 which is not chargeable against anyone.

In summary, $9,270.14 is disallowed for insufficient data and $9,059.99 is also disallowed because it pertains to metals. This totals $18,330.13 reducing the $75,538.13 figure to $57,208.00.

The GLCC defendants are charged for the costs of laboratory analysis and associated Viar administrative work for samples taken from wells located at the GLCC property ($9,446.45), the marsh ($11,907.14) and surface water from Country Pond ($4,432.08). This amounts to $25,785.78.

All defendants are charged for the costs of administrative work for background well samples, quality control samples, and blanks because such costs relate equally to the entire site, and not to any particular site location. This amounts to $19,921.12; the metals analysis charge of $9,059.99 is deducted from $28,981.11.

$11,501.10 is chargeable against Ottati & Goss defendants. There is a shortfall of $309.95.

### Peabody Clean Industries

EPA paid $1,076,862.00 to Peabody Clean Industries, Inc. for removal of drums on the Ottati & Goss site; EPA also reimbursed the U.S. Coast Guard for another $484,000.00 paid to Peabody Clean Industries. Evidence of these costs was presented at Phase II of this trial. *See* Tr. Day 2, pp. 9–11 & 17–18. $1,560,862.00, therefore is assessed against the Ottati & Goss defendants.

### BIONETICS

Bionetics participated in the Ottati & Goss cleanup, on behalf of the government, by analyzing and processing photographs of the cleanup sites between November, 1983 and November, 1984. A Bionetics representative provided testimony in Phase

I, regarding work done on the Ottati & Goss site and on the GLCC caustic lagoon.

Bionetics incurred a total cost of $10,509.99 for the services provided. The parties stipulated to the total cost, and further stipulated that the total cost would be allocated proportionately between Ottati & Goss and GLCC based upon the amount of time spent by Bionetics on each site. The allocation was determined by ascertaining the amount of time spent on the site. The stipulated allocation of costs assessed is $6,770.83 to Ottati & Goss and $3,738.17 to GLCC. (Tr. day 7, pp. 50–52).

IMC acknowledges the stipulation to the allocation of Bionetics' costs in their Request No. 610. They agree with the figures, but note only that the costs incurred were for photographic analysis.

Therefore, $3,738.17 is charged to IMC for costs incurred with regard to work performed by Bionetics.

## PRC ENVIRONMENTAL MANAGEMENT, INC.

EPA employed the services of PRC, Inc. under a Technical Enforcement Contract. PRC in turn, incurred costs as a result of its employment of several subcontractors. These various expenditures may be best addressed through individual analysis of costs allocated to each subcontractor. The subcontractors under PRC employ included Roy Weston, Inc., Life Systems, Inc., Goldberg–Zoino & Associates, Inc., Geo-Trans, Inc., Cambridge Analytical Associates, and Arthur D. Little, Inc.

The utilization of Roy Weston, Inc., primarily involved the services of Dr. John Guswa who served as an expert witness on behalf of the government during Phase I. Dr. Guswa was employed by a number of subcontractors throughout the litigation. Although his work remained consistent for the purpose of this case, his employers varied at particular intervals during the case. Dr. Guswa's employment with Roy Weston, Inc. began in December, 1984 and ended in May, 1986. The total expenditure to Roy Weston, Inc. for services provided by Dr. Guswa amounted to $28,178.49. The EPA proposes to split this charge be-

tween both the Ottati & Goss defendants and the GLCC defendants, since Dr. Guswa's work concerned groundwater contamination at both sites. The court agrees with this assessment and holds GLCC defendants accountable for $14,089.24 for expenses incurred by PRC's employ of Roy Weston, Inc.

PRC's employ of Life Systems, Inc. was for the purposes of identifying and listing five (5) experts to testify in the fields of toxicology, quantitative risk assessment, and environmental transport. The government attributes a total of 122 hours expended in performance of this task, at a total cost of $7,522.65. IMC disputed the reasonableness of this cost, since the government had already retained at least four (4) individuals who collectively possessed vast amounts of knowledge in the areas requested of Life Systems, Inc. The work performed by Life Systems was somewhat excessive in light of the existing witnesses retained by EPA. Therefore, fifty percent (50%) is disallowed. $3,761.33 is chargeable to Ottati & Goss and $3,761.33 to GLCC defendants.

GZA was employed by PRC to provide assistance in preparation of the Phase II litigation which included expert testimony. The government asserts that expenditures of $187,101.01 are directly attributable to work performed by GZA as a subcontractor for PRC. Such assertion is supported by the post-trial affidavit of Robert Van Osten.

Since the work performed by GZA involved both the Ottati & Goss site and the GLCC site, and since no allocation of work to the individual sites was performed, the government suggests an equal division of the GZA costs between the defendants. Therefore, GLCC is chargeable with these costs for GZA in the amount of $93,550.50 and $93,550.50 chargeable to Ottati & Goss.

GeoTrans, Inc. was employed by PRC. The work performed by GeoTrans included trial preparation by none other than the very capable Dr. John Guswa. Once again Dr. Guswa's work concerned past, present and future conditions of the groundwater

at the Ottati & Goss and GLCC sites. The government claims that $158,025.09 was paid to GeoTrans in return for the services of Dr. Guswa during the period from September, 1986 through April, 1987. The testimony of Dr. Guswa, however, indicated that his contractual employ with GeoTrans terminated in February, 1987 and that subsequent to this termination, he was employed under a contract with the Justice Department. The work that Dr. Guswa performed related to groundwater and the costs are to be divided equally or $79,-012.54 apiece for the Ottati & Goss and GLCC defendants.

Another subcontractor retained by PRC for the purpose of trial preparation was Cambridge Analytical Associates (Cambridge). Cambridge procured several experts to testify as to chemical analyses performed upon soil samples taken from both the Ottati & Goss site and the GLCC site. No allocation was made concerning the amount of work performed on each site. The government purports to have spent $21,513.83 for work performed by Cambridge Analytical Associates. However, the evidence reveals a total expenditure of $20,861.91. $10,430.95 is assessed against the Ottati & Goss defendants and $10,430.95 against the GLCC defendants.

Another subcontractor employed by PRC in preparation of Phase II litigation was Arthur D. Little, Inc. (Little). Little provided experts to testify on matters of risk assessment and groundwater analysis. The government asserts a total expenditure of $28,704.25 for services provided by Little, and again suggests an equal division of this cost among the defendants.

IMC's greatest objection to these expenditures concerns the manner of contracting and subcontracting by EPA. According to IMC, EPA doubled their expenses by hiring "prime contractors" who would hire "subcontractors" to perform work which the prime contractor could directly have performed.

In accomplishing a particular task, prime contractor fees would be paid in addition to subcontractor fees, unnecessarily increasing the cost.

Little's total bill of $28,704.25 shall not be reduced. Pursuant to the court's permission, the United States submitted the post-trial affidavit of Robert Van Osten of PRC who discussed the costs relative to PRC and its subcontractors. *See* Tr. Day 69, p. 17. The affidavit, as well as an attached letter to EPA and work assignment summary, demonstrates that the amount paid to Arthur D. Little, Inc. represents 92% of the total dollars spent for experts to testify on matters of risk assessment and groundwater analysis. Therefore, $14,352.12 is assessed against the Ottati & Goss defendants and $14,352.12 is against the GLCC defendants.

## DEPARTMENT OF INTERIOR COSTS

The EPA claims to have paid $2,373.79 to the Department of Interior to conduct preliminary natural resource surveys at the Ottati & Goss and GLCC sites. Unlike many of the alleged costs, the government has allocated the cost between time spent and work performed on the individual sites. Of the total expense attributed to the Department of Interior, 80% or $1,899.03 is allocated to the GLCC site. This figure is derived from the total allocation of efforts expended as a part of the Remedial Investigation/Feasibility Study, of which the natural resource surveys are included. The court accepts this allocation attributing $1,899.03 to work performed on the GLCC site paid to the Department of Interior. $474.76 is thus allocated to the Ottati & Goss defendants.

## EPA COSTS

EPA claims it incurred costs of $630,-412.62 for payroll, travel and indirect costs in this case. Of this sum, $22,971.39 is chargeable to Ottati & Goss for drum removal costs from June, 1981 to April 1982; $26,400.84 is chargeable to Louis Ottati, Wellington Goss, Ottati & Goss, Bernard Senter, Senter Transportation Co., Concord Realty Trust, Richard French, French Processing, Inc., and GLCC. $1,955.00 is chargeable to the GLCC defendants and $579,085.39 is sought to be chargeable to both sets of defendants.

EPA claims:

a. $261,648.54 was spent on salaries for EPA personnel in Region I and in Headquarters. The evidence is that payroll and salaries were $213,219.60.

b. $31,842.08 was spent for travel by EPA personnel and relates to the entire site as a whole.

c. $336,922.00 are indirect costs which include expenses for rent, utilities, supplies, clerical staff and other overhead expenses. These indirect costs necessary to operate the Superfund program cannot be attributed directly to the O & G/GLCC sites, and are therefore disallowed.

The total of salaries, travel and indirect costs is $245,061.68; $26,400.84 in non-removal costs were incurred prior to the amended and supplemental complaint filed in January, 1983 and is chargeable to Louis Ottati, Wellington Goss, Ottati & Goss, Bernard Senter, Senter Transportation Co., Concord Realty Trust, Richard French, Inc., French Processing Inc., and Great Lakes Container Corporation.

This reduces the amount to $218,660.84. EPA Region I payroll is $1,308.00 too high and the further reduction amounts to the sum of $217,352.84.

This figure should therefore be divided 50% to Ottati & Goss defendants and 50% to the GLCC defendants, or $108,676.42 for each site. Therefore, $108,676.42 is chargeable to the Ottati & Goss defendants and taking into account $1,955.00, the previously allocated sum of GLCC costs, $110,-631.42 is chargeable to the GLCC defendants.

COOPERATIVE AGREEMENT COSTS— GOLDBERG–ZOINO & ASSOCIATES, INC. AND STATE OF NEW HAMPSHIRE

In March, 1983, EPA and the State of New Hampshire entered into a Cooperative Agreement under which the State was the lead agency to oversee the development of the Remedial Investigation and Feasibility study at the Ottati & Goss/GLCC site and EPA reimbursed the State for the costs associated with the RI/FS, laboratory services, on-scene coordination, equipment, administrative costs, and other costs for the development of the RI/FS. The Cooperative Agreement was amended several times to reflect additional work to be undertaken by GZA and the State in the completion of the RI/FS.

EPA gave a grant award to the State.

The State of New Hampshire, out of many firms which were interviewed considered Goldberg–Zoino Associates (GZA) to be the most qualified to perform the work. A contract was entered into between the State and GZA for the performance of the RI/FS.

GZA subsequently proposed amendments for additional work to complete the project. The State approved the amendments.

GZA submitted progress reports and invoices to the State. The State paid the invoices after reviewing them. The State found that the work met the requirements in the contract and the United States reimbursed the State.

The State was billed for labor costs, overhead costs, supplies and other expenses, subcontractor costs and profit.

EPA spent $603,460.72 rounded out to $603,461.00 for GZA to prepare the Remedial Investigation and Feasibility Study for the Ottati & Goss/GLCC site.

All costs for supervision of the IMC removal operations and the supplemental test pit operations on the GLCC site were charged to GLCC.

Wells located on the Ottati & Goss site and down-gradient are chargeable to that site. Wells located on the GLCC site and down-gradient are chargeable to GLCC. Background and upgradient wells are allocated in cost equally to all defendants. This also pertains to seismic surveys, ground penetrating radar, magnetometer surveys and test pits.

Certain costs are not differentiated by site because the work required consideration of both sites. Costs for scientific analysis, engineering, data interpretation, meetings, management and report preparations are grouped together.

Allocation of costs are required. The Ottati & Goss defendants are chargeable in the sum of $122,542.00 and $480,919.00 is chargeable to the GLCC defendants. This is based upon 20% allocation to Ottati & Goss defendants and 80% to GLCC defendants.

In its Remedial Investigation, GZA and its subcontractors reviewed prior data and performed analyses on the Ottati & Goss, GLCC marsh and Country Pond area. After the field investigation GZA compiled more data to determine the extent of contamination and threat to the public health.

GZA and its subcontractor developed a risk and exposure assessment to ascertain whether there were any threats to public health or the environment. This focused on the need for remedial action.

In its feasibility study, GZA and its subcontractors reviewed prior work in assessing available technologies. The remedial investigation is percursory to carrying out the feasibility study.

GZA developed 18 remedial alternatives fitting into five different categories. Alternatives included disposal at an off-site facility; alternatives which attained applicable or relevant and appropriate Federal public health and environmental requirements; alternatives which exceeded such requirements; alternatives which would not attain such requirements, but would approach the level of protection provided by such requirements; and a no-action alternative.

After consultation with the State and EPA, GZA culled the number to six alternatives which were evaluated for their reliability, feasibility, degree of protection, and environmental impacts.

GZA's RI/FS has a section devoted to a wetlands assessment. GZA's assessment described possible alternatives for abating the contamination in the wetlands and the potential impact on the wetlands.

Work on the Remedial Investigation commenced in September, 1983. The Feasibility Study started in the spring of 1985. Initially, the 1982 National Contingency Plan was relied upon in developing the RI/FS. Subsequently the 1986 National Contingency Plan was relied upon.

The observed case represented what was most likely to happen at the site and the worst case is just what the term implies. At the time when the Remedial Investigation began, the only guidance on the development of RI/FS was the National Contingency Plan. The project manager had his own discretion. The Record of Decision was done by the EPA. Remedial Investigation/Feasibility Study data from the Ottati & Goss/GLCC site was used in making the ROD.

It was more efficient and feasible for GZA to utilize one RI/FS for the two sites rather than doing them separately.

The RI/FS do contain much material which can be viewed as arbitrary. For example, data and the court's findings that there was lack of evidence that there was any risk to residential wells or Country Pond was blithely ignored. This area will be discussed later in this opinion.

The "worst-case" is qualitative and not quantitative. It is not likely that the "worst-case" scenario will occur.

The State of New Hampshire in its contract with EPA did not separate the costs between the sites. It was found to be more efficient for GZA to maintain one accounting system for the entire site project.

In the Cooperative Agreement budget, the biggest category was for the Remedial Investigation Feasibility study, laboratory supplies, personnel, equipment leasing and administrative costs. This amounted to $572,412.00.

EPA seeks the recovery of $298,028.37 under the Cooperative Agreement with the State. This is for overseeing the development of the RI/FS and associated tasks from 1983 to the present time. Expenses are broken down as follows: $15,698.91 for office expenditures; $1,996.84 for office equipment and furniture; $195,162.32 on salaries for State employees in the Water Supply and Pollution Control Commission and the Department of Environmental Services; $30,496.95 for employee benefits

such as insurance; $4,710.43 for in-state travel by State employees; $2,787.99 for out-of-state travel by State employees; $23,165.80 for indirect costs based on a percentage basis, ranging from 6.4 to 11.06 percent of costs incurred on the Ottati & Goss/GLCC project; $14,797.68 for the lease purchase and maintenance of a gas chromatograph/mass spectometer used on the Ottati & Goss/GLCC sites; $8,500 for the purchase of a computer; $711.45 for an audit.

The $298,028.37 under the Cooperative Agreement is chargeable against both sets of defendants or $149,014.19 each.

## DEPARTMENT OF JUSTICE COSTS

EPA is claiming $1,470,383.13 for work performed by the United States Department of Justice in the litigation of this case from 1980 until the present time.

$756,701.40 is sought for salaries for Department of Justice attorneys and paralegals for their time spent on this case.

In *United States v. Northeastern Pharmaceutical & Chemical Co.*, 579 F.Supp. 823 (W.D.Mo.1984), *rev'd on other grounds*, 810 F.2d 726 (8th Cir.1986) (hereinafter NEPACCO), the court while recognizing that it is well settled law that a party cannot recover attorney fees unless provided by contract or statute, did allow recovery. The court found specifically that under CERCLA, Section 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A), responsible parties are liable for "all costs of removal or remedial action."

This court does not quarrel with the finding of the Missouri Court under the circumstances of that case. The ruling concerning attorneys fees was affirmed by the Eighth Circuit in 1986. *See NEPACCO*, 810 F.2d at 747–48. The facts in this case are unique. The court has already alluded to the conduct of the EPA and United States counsel with regard to the conduct of both phases of this trial. To allow full attorneys fees would not be equitable as it would appear to be a condonation of untoward conduct. Accordingly, the court, while not disallowing the fees in toto, reduces them by 50% to $378,350.70.

The plaintiffs spent $103,408.27 for expert witnesses during Phases I and II of trial and for trial preparation. The sum of $25,856.54 paid to the law firm of Brown & Nixon is disallowed. The balance or remainder of the witness costs, $77,551.73 covering the payment of witnesses who testified on behalf of the United States is chargeable to both sets of defendants.

The bill of $89,529.78 allegedly spent for employee benefits, such as insurance and retirement contributions for paralegal time spent on this case is disallowed.

$106,811.80 is charged for Justice Department attorneys and paralegals to travel on matters relating to the case. Being consistent in allowing only 50% of attorneys fees, the travel expense is similarly reduced to $53,405.90.

$641.97 for freight, $1,332.67 for printing and $80.00 for supplies for this case are equally chargeable to both sets of defendants.

In summary, $3,433.68 is chargeable to all of the Ottati & Goss defendants; $23,981.03 is chargeable to Louis Ottati, Wellington Goss, Ottati & Goss, Inc., Bernard Senter, Senter Transportation Co., Concord Realty Trust, Richard French, French Processing, Inc., and Great Lakes Container Corporation. Additionally, $511,362.97 is chargeable against the Ottati & Goss and GLCC defendants or $255,681.49 each. If legal fees were charged by the United States for work involving Geochem, they shall be subtracted from the sum of $378,350.78 (Tr.p.95,d.27, Phase II).

## PREJUDGMENT INTEREST

The United States seeks interest on costs incurred as of October 10, 1986, the date of its filing and updated cost summary. The State of New Hampshire has joined in the findings of fact which the United States has filed.

In *NEPACCO*, 579 F.Supp. at 852, the court held that the United States could recover prejudgment interest under Section 107 of CERCLA. The court stated that, "[i]n the absence of statutory provision the

granting of prejudgment interest lies within the discretion of the Court." *Id.* (citations omitted).

The decision to award prejudgment interest was based on what the court deemed to be the intent of Congress that CERCLA be given a broad interpretation so as not to restrict the liability of responsible parties.

There is law to the contrary. *See United States v. South Carolina Recycling & Disposal Inc.*, 20 Env't.Rep.Cas. (BNA) (D.S.C. 1984) now on appeal in the Fourth Circuit where EPA's prejudgment interest claim was denied.

■ The court in this case, however, denies prejudgment interest. Interest shall accrue on or after December 9, 1985, the date of the judgment on the liability phase of this action.

The court's decision is based upon the following reasons because of what has transpired in this case. Some of these reasons have been alluded to in other areas of this opinion.

The United States has on many occasions since it commenced litigation on May 15, 1980 done the following: ignored court orders, delayed the progress of this case, resulting in sanctions being imposed in the liability phase, attempted to recoup the amount of the sanctions in this phase of the trial, led the court to assume it had authority to settle when it had none, at the time making a mockery of a settlement conference, when former defendant, Geochem's motion to dismiss was granted, attempted to recover sums expended in that segment of the litigation against the remaining defendants and a general insouciance about judicial time with general oblivion to the demands of time on the defendants.

*West Virginia v. United States*, 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987) is not apposite. In that case the State argued that it should be exempt from paying prejudgment interest to the United States because, under its own law, it may not be held liable for interest unless it has consented to be. It is interesting to note the following:

The District Court held that whether interest had to be paid depended on a balancing of equities between the parties; the Court of Appeals rejected such an approach, as do we. This is not to say that an equitable consideration such as laches cannot bar an otherwise valid claim for interest, *see Board of Comm'rs of Jackson County v. United States*, 308 U.S. 343, 352–353, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939).

107 S.Ct. at 706 n. 3.

### THE IMC EQUITABLE OFF–SET

■ Another issue for the court's consideration is IMC's requested equitable off-set against the court's ultimate levy of damages. The requested off-set pertains to IMC's expenditure of $1,500,000.00 on a voluntary cleanup of the IMC/GLCC site from 1984 through 1985. In discussing this issue, reiteration is necessary of findings already made by the court.

On April 19, 1984, IMC filed a motion requesting leave of this court to immediately proceed in a voluntary cleanup effort at the Kingston Steel Drum site, in order to remove and dispose of *all* buried drums on the site, and to clean up the soil at the site. *See Doc. # 629.* This court granted IMC permission to begin voluntary cleanup of the site on May 24, 1984, provided that such cleanup operations were performed in accordance with the requirements of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, and RSA 147–A. The court candidly was pleased that someone was taking affirmative action in this case.

In addressing IMC's request for an equitable offset, the government asserts that IMC is not entitled to any offsetting credit. *See Doc. # 1382, p. 52 (L.212).* The government cites the inadequacy of IMC's cleanup operation and failure to produce evidence substantiating the alleged cost of the attempted cleanup. *Id.* at 52–53. (The government claims that the documentation which was presented concerning the cleanup operation was insufficient for the amount requested.)

There is no question that IMC expended a good deal of time, money and effort in an

attempt to clean up the GLCC site. The real issue is one of effectiveness. The government alleges that IMC's attempted cleanup amounted to a somewhat lackluster effort achieving wholly unsatisfactory results. IMC alternatively argues that the cleanup was performed in accordance with EPA and state standards and that continued monitoring by government employees insured a successful cleaning of the site.

In reviewing the evidence, it is clear that IMC's attempted cleanup was not a paragon of excellence. Tests performed subsequent to the cleanup excavation reveal the continued presence of toxins and contaminants randomly located throughout the GLCC site. This is not to say that the attempted cleanup was entirely without success.

The government contends that the IMC excavation involved only one-third (⅓) of the entire site. Although statistically correct, this contention is somewhat misleading. The GLCC site encompasses 256,132 square feet. The evidence reveals that only 75,000 square feet of the site was excavated.

The numbers are misleading in that they do not reveal the manner or mode of the attempted cleanup. IMC did not remove a land mass measuring 256,132 square feet, and six (6) to eight (8) feet deep. Rather, the attempted cleanup consisted of a series of smaller trench-like excavations traversing the entire area. Sophisticated technology was then used to "scan" trench walls and floor in order to detect areas and concentration levels of uncovered contamination. This technology included use of magnetometer surveys and ground-penetrating radar.

Measurements were taken, surveys recorded, and scannings were performed, prior to, during, and after the IMC excavation was completed. Although effective in many respects, the advanced methods employed in excavating the site, were somewhat limited. For instance, the use of magnetometer surveys revealed areas in which large numbers of toxin-filled drums were located. This revelation provided for an expeditious approach to the removal of contaminants. However, the surveys could not, and did not, reveal areas of contamination unassociated with metallic containers. This precluded discovery of VOCs stored in plastic and latex drums or containers. Indeed, there is evidence substantiating post-excavation discovery of plastic containers.

As previously noted, the excavation was not successful in purging the area of toxin-filled receptacles. This, however, should not deprecate or diminish the large amounts of toxins which were removed from the site, as a result of IMC's excavation efforts.

The contamination present in the groundwater on the GLCC site appears to have been a subordinate concern during IMC's cleanup attempt. The evidence is replete with instances of toxins seeping into groundwater during the excavation. An effort was made to aerate excavated soil and to test aerated soil for HNU levels. The efficacy of this effort, however, is somewhat questionable.

Nonetheless, IMC undertook an attempted cleanup of the GLCC site. It is axiomatic in light of the foregoing to summarize that this cleanup was not successful in scouring the GLCC area of artificially stored contaminants. However, according IMC no credit for the cleanup effort impugns basic equitable dogma.

IMC claims that $1,500,000.00 was expended in its attempted cleanup of the GLCC site. IMC requests that it be given an offsetting credit of this entire amount, against any amount of damages for which this court may deem it liable. An offset of this nature is entirely excessive. IMC has produced very little evidence pertaining to expenses incurred as a result of the attempted cleanup, to support this request.

While denying any off-set to IMC, the court does grant IMC an indirect credit or off-set. If EPA is adamant about aerating or incinerating the 5.88 acres it does so at its own expense. In one of its post 1984 IMC views, the court noted the remedial work and present almost verdant condition of the site. At the same time, the court is fully cognizant that in its subterranean

depths, there is noxious groundwater under the site.

### REMEDY AND THE FUTURE OF THE SITE

CERCLA, as amended by SARA vests the President with the exclusive authority to select remedies for Superfund sites. The President has delegated his authority to select remedies at sites listed on the National Priorities List to EPA.

Section 121(a) of SARA provides:

Selection of Remedial Action—The President shall select appropriate remedial actions determined to be necessary to be carried out under Section 104 or secured under Section 106.

Merrill Hohman, Director of the Waste Management Division, Region 1, U.S. Environmental Protection Agency is responsible for administering the Superfund, RCRA and Underground Storage Tank Programs in New England.

CERCLA and the NCP outline the steps that must be taken prior to the cleanup of a site. EPA selects a remedy which is set forth in a Record of Decision (ROD).

In region 1 of EPA, which includes New Hampshire, Hohman has the final responsibility for insuring that the ROD meets all appropriate technical and legal requirements.

EPA issued a preferred remedy for the site on October 29, 1986 and sent it out for public comment. The public had five weeks in which to comment and that period expired on December 5, 1986.

On January 16, 1987, EPA issued a final remedy decision for the site in a ROD signed by the Region 1, EPA Administrator. The government responded to the comments that it received.

EPA's selected remedy comprises three types of treatment. The treatments are designed to extirpate hazardous substances at the site. This the EPA proposes to do by the following remedies: incineration of PCB contaminated soil and sediments, thermal aeration of VOC-contaminated soil, treatment of groundwater.

The source control method has a two-fold purpose. It reduces direct contact with the chemicals and it removes chemicals so that they will not leach into the groundwater, thus exacerbating the groundwater contamination.

EPA also proposes to incinerate sediments which contain PCBs greater than 1 ppm. This court has already ruled that IMC complied with standards then extant when they reduced PCBs to 50 ppm. If this is now EPA's desire, they do it without IMC being liable for this cost.

The site is zoned rural residential according to the Kingston Zoning Ordinance. The knowledgable Senator Bartlett, a realtor and a legislator for the Kingston area testified. A rural residential area means that you can build a single family or a two-family dwelling or a commercial building, provided you have the vote of the community. The court is of the opinion that in the near future of five to ten years this area would not have a good saleable potential because of this litigation and monitoring of the site.

### MONITORING

With respect to the groundwater remedy, there is no question that it will have to be monitored in the future. How long? It can't be stated with accuracy at this time.

Practically, the onus of this chore will be borne by the State of New Hampshire. The eventual decision is left to the collective judgment of the United States and the State of New Hampshire. The monitoring wells will have to be sampled on an annual basis. Any party interested can indicate to the monitoring plaintiff that they would like to be so advised sufficient time in advance in order to participate, observe, or split samples. Laboratory results shall be made available to all parties who participate. Costs of the sampling and laboratory testing shall be allocated equally between the parties.

If sampling discloses any untoward result and the parties are unable to resolve the issue then and only then shall it be submitted to the attention of the court.

Even the most confirmed optimist after viewing the history of this case would have to agree to the following. Monitoring is inevitable. There will be issues in the future concerning the wetlands and development of the site. Hopefully, the Town of Kingston ordinances and the statutes of the State of New Hampshire if apposite can control.

The PCBs in South Brook shall be removed. The cost of removal shall be borne by all defendants. In this instance PCB contamination shall be reduced to 20 ppm. The imposition of a 20 ppm level applies to both soils and sediments.

## STANDARD OF REVIEW

■ The court agrees with plaintiffs' contention that the standard of review of EPA's selection of response action under CERCLA is governed by the arbitrary and capricious standard, but not in this case. The court did not limit its findings to the administrative record.

42 U.S.C. § 9613(j)(2) was amended by SARA on October 17, 1986 and it provides: "(2) Standard. In considering objections raised in any judicial action under this act, the court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law."

The court followed the preponderance of the evidence standard. *Zellers v. Chase*, 105 N.H. 266, 268, 197 A.2d 206 (1964).

This issue was ruled on prior to the commencement of the damage phase of this trial on February 2, 1987. The court based its ruling on the following quote from *Bradley v. Richmond School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed. 2d 476 (1974): "We anchor our holding in this case on the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary."

In *Dedham Water Company v. Cumberland Farms Dairy*, 805 F.2d 1074, 1084 (1st Cir.1986) the *Bradley* case was cited, in the following context: "The rule that a court must apply the law in effect at the time it renders a decision is not, of course, an absolute mandate. The rule does not apply if it would result in manifest injustice or if there is statutory direction or legislative history directing otherwise." In this case suit was commenced on May 15, 1980, the liability phase of the trial has ended and the amendment known as SARA had become effective a little more than three months before the damage phase of the trial. To allow the damage phase to be decided at this point in time solely on the administrative record would really be manifest injustice.

## COST OF THE GROUNDWATER REMEDY

The groundwater remedy as projected by the plaintiffs is approximately $5,812,-500.00. This consists of an initial capital cost of $2,562,500 and operation and maintenance costs of $3,250,000.00. It also assumes treatment at a rate of 100 gallons per minute for five years.

Extraction wells capital costs are $80,-000.00 for purchase and installation of the wells. $180,000.00 for purchase and installation of pumps and piping. The estimated number of wells is 22, with average depths of 25 feet. The concept of a roadway through the marsh is not viable if it contravenes the court's ruling. See page 986 of this opinion. Costs for treatability and air quality monitoring are associated with the groundwater treatment. Treatability studies are $50,000.00 and air quality monitoring $5,000.00.

Direct capital costs including the road through the swamp amount to $2,050,000. Indirect capital costs were computed at 25% for a total capital cost for the groundwater extraction and treatment system in the sum of $2,562,500.00.

The estimated annual cost for operation and maintenance amounts to $855,000.00.

Discounted at a 10% rate would give a present worth figure of $5,812,500.00.

The exact amount cannot be calculated until there is a reasonable cost estimate regarding the marsh. As stated, the court does not approve the roadway as proposed. The cost of skid mounted bombardier equipment or a decking system may be more or less than the proposed roadway.

The court has also found that none of the defendants are in anyway responsible for metals in the groundwater. If that is a factor in the cost estimate it should also be discounted in the overall cost.

## THE STATE OF NEW HAMPSHIRE CLAIMS

The State of New Hampshire has incurred a total of $200,078.00 in past costs with respect to the Ottati & Goss/GLCC site.

The State has recovered $80,000.00 in settlements made with the Generator Defendants, namely, General Electric, Solvents Recovery Service, Lilly Industrial Coatings and K.J. Quinn. Thus, the State reduces the amount of past costs for which it seeks reimbursement from the remaining defendants by $80,000.00. The remaining defendants are alluded to on page one of this opinion.

Mr. Labelle of the New Hampshire Air Resources Agency spent from ten to twelve days responding to interrogatories propounded by the generators and the then third-party plaintiff GLCC. The court assesses damages against the generator defendants and GLCC in the sum of $1,200.00.

The Attorney General's Office cost per hour of attorney time ranged between $26.31 in 1982 and $38.50 in 1987. These are very reasonable hourly rates.

A total cost to the New Hampshire Attorney General's Office for litigation of this case from January 1, 1987 to July 22, 1987 in the sum of $45,293.04 is assessed against all defendants.

The further sum of $106,721.84 is assessed against all defendants commencing from the date the State appeared in this case through December, 1986. The court is cognizant of the fact that timesheets for the years 1979, 1980 and 1981 were discarded by the Attorney General's Office and not charged. This involved a great amount of attorney time for which there is no charge.

The State incurred costs to the New Hampshire Division of Public Health Services, Office of Waste Management.

Mr. Gordon of that agency spent time at the site monitoring the IMC and GLCC soil and drum removal operation in 1984 and 1985. $5,228.39 of expenses which the State incurred through Gordon is reasonable and assessed against IMC and GLCC.

Additionally all parties privy to the second phase of the trial stipulated as to the following: that the agency had incurred $7,806.34 in expenses for work performed in connection with the Ottati & Goss/GLCC site by a Mr. John Liptak. $7,063.49 of this sum is chargeable solely against IMC; $592.26 against all liable parties; $150.59 against all liable parties.

Personnel from the New Hampshire Water Supply & Pollution Control Commission monitored groundwater at and contiguous to the Ottati & Goss/GLCC site. Its expenses of $33,778.44 is reasonable and is chargeable against all defendants.

## TOWN OF KINGSTON CLAIMS

The attorneys representing the Town of Kingston have submitted a bill to the town in the sum of $102,569.75 and out-of-pocket expenses amounting to $5,386.54 or a total of $107,956.29.

The Town of Kingston is a prevailing party under RCRA [33 U.S.C. § 1365], as amended.

Attorneys fees prior to October 10, 1986 were $73,182.25 and from October 10, 1986 through July 1, 1987 were $29,387.50 and are reasonable.

Expenses through October 10, 1986 were $4,234.90 and to July 1, 1987 were $1,151.64 or a total of $5,386.54.

GLCC has been found liable for violating N.H. RSA § 149:8(III)(a) (1977). Kingston and the State can seek relief for the public nuisance it created on the GLCC site. Ad-

ditionally, GLCC has been found liable to the Town of Kingston under RCRA § 7003 and the Clean Water Act 33 U.S.C. § 1365. *United States v. Ottati & Goss, Inc.*, 630 F.Supp. 1361, 1416–1418 (D.N.H.1985). IMC has agreed to indemnify GLCC against any judgment that might be rendered against GLCC with respect to contamination of the GLCC site or down gradient contamination. See the ex parte report filed with the court dated March 14, 1984 entitled stipulations disposing of third-party complaints between GLCC and IMC.

The Town of Kingston and or its selectmen are entitled to an award jointly and severally against the Ottati & Goss defendants, and GLCC for expenses and attorneys fees. This does not include the generators or IMC individually, that is sans its indemnity agreement.

## CIVIL PENALTY ASSESSED AGAINST GLCC

■ This court in Phase 1 of the trial found that neither GLCC or its predecessors were issued a National Pollutant Discharge Elimination System ("NPDES") permit by the State of New Hampshire. *United States v. Ottati & Goss, Inc.*, 630 F.Supp. at 1401. This was in violation of Section 309 of the Clean Water Act, 33 U.S.C. § 1319. *See Chesapeake Bay Foundation v. Gawaltney of Smithfield*, 611 F.Supp. 1542 (E.D.Va.1985), *aff'd*, 791 F.2d 304 (4th Cir.1986), *cert. granted*, 479 U.S. 1029, 107 S.Ct. 872, 93 L.Ed.2d 827 (1987).

The court does impose a total fine of $5,000.00 for the violation on December 1, 1982. A violator's willfulness or negligence, or lack thereof, is one factor to consider in arriving at a final penalty amount. Considering the events then extant at the time or times of the violation the court does not find that GLCC's actions were willful. *Cf. Chesapeake Bay Foundation*, 611 F.Supp. at 1561.

Some of the pollutants discharged by GLCC were hazardous substances as defined by CERCLA, hazardous wastes under RCRA and toxic pollutants under the Clean Water Act.

## IN RE: ORDER ON MOTION TO ALTER, AMEND AND CLARIFY (DOC. # 1401)

Subsequent to this court's March 17, 1988 opinion with regard to Phase II of this case, all parties submitted motions to alter, amend and clarify. This court issued its order amending its Phase II findings on July 22, 1988. To believe that the order will put an end to this long and arduous case is just plain hyperbole. Sections of that order have been incorporated into the amended damage phase opinion. Other apposite sections of the order are as follows:

### EPA'S Liability

The court's findings with regard to EPA's liability will not be altered.

### IMC Finding 123

If IMC Finding 123 is inconsistent with the court's Phase I finding at 630 F.Supp. 1377, wherein the court stated, "[d]rums were buried during Kingston Steel Drum's, IMC's and GLCC's ownership" then it should be changed to conform to such Phase I finding.

### Department of Justice Costs

The court will not alter or amend its decision with regard to Department of Justice Costs. Contrary to the government's position, certain Department of Justice costs were not omitted for lack of indagation. Costs for rent and transcripts were intentionally omitted and are disallowed.

### EPA COSTS

With regard to the payroll amount of $213,219.60 reference is made to Day 9, page 22 (Tr). The court's ruling of March 17, 1988 stands.

### EPA's Indirect Costs and DOJ Employee Benefits

There is ample evidence of record why this court allowed the State of New Hampshire's indirect costs and disallowed indirect costs of the United States. To add further fuel to the fire, the United States

has the temerity to state there is no reason for its ustulation by the court.

Without reiterating what is self-evident, the cavalier and hubristic actions of EPA in this litigation warrant the use of punitive measures by the court. This litigation appears to be interminable and this ruling may be considered a harbinger if future court hearings are necessitated relative to monitoring.

### Ruling on Fifty–Fifty Division of Costs

This court is mindful of the joint and several liability already imposed. In assessing distribution of costs, however, equity plays a significant role. The age-old maxim that "one who seeks equity must do equity" applies with equal force to the government. Throughout this trial, the EPA has refused to allocate costs between the two sites even after they knew IMC could not be held liable for any costs associated with the Ottati & Goss site and altogether failed to advise their contractors of IMC's non-liability for Ottati & Goss. Furthermore, IMC and other defendants introduced evidence to show that allocation was beyond peradventure. Finally, reference is made to this court's reasons for denying EPA's indirect costs, *infra.*

This court stands by its prior rulings with regard to cost allocation.

### Calculation of Credits

This order pertains to calculation of two credits which were assessed against the United States' recovery in the court's decision of March 21, 1988. Specifically, at page 24 of the opinion the court ordered IMC credited with the NUS costs relating to events of September 9, 1983. On page 50, the court ordered a credit against the legal fees incurred by the United States for its litigation against the dismissed defendant Geochem. The United States has calculated the credits (Docs. # 1447 & 1448) and IMC has responded (Docs. # 1435 & 1444).

## NUS CORPORATION COSTS

The United States has submitted its calculation of the credit for NUS costs. $544.61 represents the cost for NUS personnel on September 9, 1983. $319.30 represents the costs expended by NUS for drum removal in the weeks of September 16 and 23, 1983. Additionally, $1,737.00 is attributable to subcontractor costs for a subcontractor to haul the drums to a different location. (*See* Tr. day 6, at 81 (Phase 2)).

The United States' calculation of credits for NUS costs is adopted by the court and incorporated by reference. IMC is entitled to a credit of $2,660.91 for the work performed by the NUS contractors and subontractors relating to the drum puncture of September 9, 1983.

### Geochem Costs

The United States has submitted a calculation of the attorney salaries spent by the Department of Justice in litigating against Geochem. $7,890.10 represents salaries of Attorneys Sheila Jones, Lloyd Guerci and Michael Hill, supported by time sheets and affidavits. $457.20 represents the salary of EPA Attorney Philip Boxell for three eight-hour days involved in matters relating to Geochem. $105.78 represents Attorney William Evans' presentation of testimony involving metals from Dr. Klaussen. The government's breakdown of 34 hours multiplied by $24.89/hr., divided by 8 (one-eighth of testimony related to metals), is reasonable. Also $633.17 represents legal fees in presenting the testimony of the Versar witnesses concerning analysis of metal samples. Thus, $9,086.25 represents the government's calculated Geochem credit.

The government's figure for total time attributable to the Geochem case does not include any itemized figure for Attorneys Moerke or Cook. The evidence filed with the court shows that Attorney Moerke billed a total of 185 hours to this case with 115.9 hours of that total time, or 63% of his billable time, charged to the case between November 1, 1982 and February 29, 1984. 40.57 hours are attributable to the Geochem case. 117.50 hours are charged to the case by Attorney Cook. Thus, calculating these additional hours at Attorney Jones' and Attorney Hill's prevailing billa-

ble rates results in additional charges attributable to the Geochem case of $3,249.77.

The total legal cost figure for the Geochem litigation is $12,336.02. Applying the 50/50 percentage basis allocation, IMC and GLCC are entitled to a credit of $6,168.01 and the nonsettling Ottati & Goss defendants are entitled to a credit of $6,168.01 for Geochem litigation costs.

### Calculation of Interest

Interest rates shall be calculated by the Clerk of Court as he does in the usual course of court business. This will be at the prevailing rates commencing from December 9, 1985. The calculation of interest owed shall be within 60 days of the court's ruling on the cost issues.

### IN RE: ORDER ON MONEY JUDGMENT

This order on Money Judgment is to be incorporated into the court's memorandum opinion of March 17, 1988, *United States v. Ottati & Goss, Inc.*, No. 80–225, slip op. (D.N.H. March 17, 1988). For the purpose of this judgment the term "Ottati & Goss defendants" shall include the following defendants: Louis Ottati, Wellington Goss, Ottati & Goss, Inc., Richard French, French Processing, Inc., Lewis Chemical Company, Bernard Senter, Senter Transportation Company, Concord Realty Trust and Great Lakes Container Corporation (GLCC). The term GLCC defendants shall mean GLCC and International Minerals & Chemical (IMC).

1. The Ottati & Goss defendants are hereby adjudged jointly and severally liable to the United States for the following amounts:

| | | |
|---|---|---:|
| a. | Peabody Clean Industries Costs | 1,560,862.00 |
| b. | Kingston Fire Department Costs | 1,694.00 |
| c. | Mason & Hanger–Silas Mason Co. Costs | 17,601.83 |
| d. | I.T. Corp. Costs | 16,334.20 |
| e. | EPA Payroll during drum removal | 22,971.39 |
| f. | NUS Costs | 11,180.50 |
| g. | Techlaw Costs | 11,639.05 |
| h. | GCA Costs | 137,489.50 |
| i. | Arthur D. Little Costs | 4,058.84 |
| j. | IT Atlantic Services Costs | 35,284.88 |
| k. | Ecology & Environment Costs: Labor | 62,652.08 |
| | Subcontractors | 12,922.05 |
| l. | Viar Costs | 11,501.10 |
| m. | Bionetics | 6,770.83 |
| n. | PRC Costs: | |
| | (i) Roy F. Weston Costs | 14,089.24 |
| | (ii) Life Systems, Inc. Costs | 3,761.33 |
| | (iii) GZA Costs | 93,550.50 |
| | (iv) Geo Trans Costs | 79,012.54 |
| | (v) Cambridge Analytical Costs | 10,430.95 |
| | (vi) Arthur D. Little Costs | 14,352.12 |
| o. | Department of Interior Costs | 474.76 |
| p. | EPA Costs | *108,676.42 |
| q. | RI/FS Costs | 122,542.00 |
| r. | Cooperative Agreement Costs | 149,014.19 |
| s. | Department of Justice Costs | 259,115.17 |
| | (i) payroll predating amended complaint | **23,981.03 |
| Total | | 2,791,962.50 |

2. IMC and GLCC are adjudged jointly and severally liable to the United States for the following amounts:

| | | |
|---|---|---:|
| a. | Demolition of the Building | 82,375.00 |
| b. | NUS Costs: Less NUS Credit ($2,660.91) | 21,370.59 |
| c. | Techlaw Costs | 11,639.05 |
| d. | GCA Costs | 82,151.50 |
| e. | Arthur D. Little Costs | 4,058.84 |
| f. | Ecology & Environment Costs: Labor | 62,652.08 |
| | Subcontractors | 13,676.28 |
| g. | Viar Costs | 25,785.78 |
| h. | Bionetics Costs | 3,738.17 |
| i. | PRC Costs: | |
| | (i) Roy F. Weston Costs | 14,089.24 |
| | (ii) Life Systems, Inc. Costs | 3,761.33 |
| | (iii) GZA Costs | 93,550.50 |
| | (iv) GeoTrans Costs | 79,012.54 |
| | (v) Cambridge Analytical Costs | 10,430.95 |
| | (vi) Arthur D. Little Costs | 14,352.12 |
| j. | Department of Interior Costs | 1,899.03 |
| k. | EPA Costs | 110,681.42 |
| l. | RI/FS Costs | 480,919.00 |
| m. | Cooperative Agreement Costs | 149,014.19 |
| n. | Department of Justice Costs | 255,681.49 |
| Total | | ***1,520,789.10 |

3. The Ottati & Goss defendants and IMC are adjudged jointly and severally liable to the United Stats for the following amounts:

| | | |
|---|---|---:|
| a. | NUS costs | 281.00 |
| b. | Viar Costs | 19,921.12 |
| Total | | 20,202.12 |

\* Of the 108,676.42 EPA costs chargeable to the Ottati & Goss defendants, $26,400.84 is not chargeable to Lewis Chemical Company.

\*\* The $23,981.03 Department of Justice Costs chargeable to the Ottati & Goss defendants is not assessed against Lewis Chemical Company.

\*\*\* This total does not include the costs for fencing which are borne against IMC. It has come to this court's attention that mu-

tual plans are being devised between IMC and the State of New Hampshire. IMC has submitted a cost estimate of $89,100.00.

## IN RE: ORDER ON MOTION PERTAINING TO FUTURE RESPONSIBILITIES OF THE DEFENDANTS

This Order sets forth the respective responsibilities of the parties, including EPA, pursuant to the Opinion and the Consent Decree between Plaintiffs and the Settling Ottati & Goss defendants.

## WORK TO BE PERFORMED ON AND UNDER THE OTTATI AND GOSS PORTION OF THE SITE

Under the Consent Decree, General Electric, SRS and Lilly are currently performing EPA's soil remedy for the Ottati & Goss portion of the site under the state and federal governments (plaintiffs') oversight and subject to plaintiffs' approval. Settlors also have contributed towards cleanup of the groundwater under the Ottati & Goss portion of the site.

The groundwater cleanup under the Ottati & Goss portion of the site will be performed by the non-settling Ottati & Goss defendants (Great Lakes Container Corp., Louis Ottati, Wellington Goss, Ottati & Goss, Senter Transp. Co., Bernard Senter, Concord Realty Trust, Inc., Lewis Chemical, Richard French, French Processing, Inc.). EPA's target goal of 5 ppb for the four indicator compounds will be met. The extraction system will be designed in accordance with Paul Sanborn's testimony. (Day 15, pp. 50–66 and United States Exhibit 633).

In the event the non-settling defendants are not able to perform the remedial action, plaintiffs, pursuant to the Consent Decree, will clean up the groundwater under the Ottati & Goss portion of the site.

The court is of the opinion that soil remediation on any site has not commenced at the date of this order excepting of course, the soil remediation of IMC and GLCC on the 5.88 acres of land. Accordingly, a detailed order setting forth the timing of implementation is not appropriate at this time. Within thirty days after completion of the soil remedy, plaintiffs shall submit a detailed order governing the design, construction and operation of the groundwater system.

## WORK TO BE PERFORMED (GLCC SITE AND THE MARSH)

That defendants GLCC and IMC (in its own capacity and pursuant to the indemnity agreement with GLCC) (hereinafter collectively referred to as IMC) conduct the work relating to the GLCC site and IMC also perform the work relating to the marsh as detailed in the EPA Record of Decision ("ROD") (U.S. Exhibit 375) and set forth below:

Remove sediments in South Brook and the marsh to a level of 20 ppm of PCBs and properly dispose of them;

Design and construct a groundwater extraction and treatment system for the GLCC site and the marsh which will clean up groundwater underneath the GLCC site and the marsh to a level of 5 ppb for the following compounds: benzene, 1.2 dichloroethane, trichloroethylene and tetrachloroethylene. Achievement of target levels will be defined as continuously meeting the levels for the indicator compounds for a period of three years at Route 125 and other monitoring wells to be identified by Plaintiffs (U.S. Exhibit 375 at p. 28).

### Extraction System

The groundwater extraction and reinjection system shall be installed as soon as possible.

The extraction system for the marsh is to be designed and constructed as follows:

If the wells are installed when the ground is frozen, a skid-mounted bombardier system, as described generally in the testimony of Mr. John Sullivan, Tr. Day 59, pp. 108–110, 128, 132, shall be used;

If the wells are installed when the ground is not frozen, a decking system to be supported either by piling or a flotation system, as described generally in the testimonies of Mr. John Sullivan, Tr. Day

59, pp. 107–110, and Mr. Michael Powers, Tr. Day 59, pp. 35–38, shall be used.

Extraction wells shall be installed in areas designated as D, E and F in the U.S. Exhibit 451 (a chalk drawn by Mr. Sanborn), and in Sketch B of U.S. Exhibit 693 (report of Michael Powers), unless the parties agree that the wells should be otherwise located.

### TREATMENT SYSTEM

Conduct treatability studies to determine the final treatment system necessary to meet EPA's target goals.

### SCHEDULE

Within 60 days of this Order, IMC shall issue Requests for Proposals ("RFP") for a reputable, qualified contractor to conduct the work.

All work performed by IMC shall be performed by qualified contractors in accordance with the following schedule and the Scope of Work.

Within 120 days of the date of this order, IMC shall submit to plaintiffs a Draft Scope of Work. The Scope of Work shall include: (a) a narrative describing the work to be accomplished under Scope of Work paragraphs (1)—(4) below; (b) the development and submittal of the plans described under Scope of Work paragraph (5)–(i) below.

Plaintiffs will either approve the Draft Scope of Work or require modifications and will notify IMC in writing of such approval or required modifications.

Should plaintiffs require modifications to the SOW, IMC shall have 20 days from the date of receipt of plaintiffs' written requirement of modifications to make such modifications and submit the revised Draft Scope of Work.

The Scope of Work shall include the following components:

Removal and proper disposal of contaminated sediments in South Brook and the marsh containing greater than 20 ppm PCBs;

Design, construction, operation and maintenance of a groundwater extraction and reinjection system for GLCC and the marsh;

A treatability study to refine the parameters of the treatment system;

Design, construction, operation and maintenance of a treatment system to meet EPA's target goals for the four indicator compounds;

Quality Assurance Project Plan including (i) quality assurance/quality control plan; (ii) health and safety plan; (iii) spill/volatile organic release contingency plan; (iv) sampling plan;

Field Operation Plan, including (i) operations and maintenance plan; (ii) project coordination and management plan; (iii) excavation plan; (iv) air monitoring plan; (v) full scale pilot procedural plan; (vi) Community Relations Support Plan; (vii) Reporting Plan.

### Remedial Design/Remedial Action Involving Removal and Disposal of PCB Sediments

Within sixty days of plaintiffs' written approval of the Scope of Work, IMC shall issue an RFP for the removal and proper disposal of PCB sediments in South Brook and the marsh.

Within thirty days of plaintiffs' written approval of the Scope of Work, IMC shall select a contractor to conduct the PCB removal and disposal and submit the name to plaintiffs.

Within sixty days of plaintiffs' written approval of the Scope of Work, IMC shall submit a Remedial Design for PCB Removal and Disposal of Sediments which shall include plans, specifications, schedules and other pertinent information as set forth in EPA OSWER Directive 9355.0–4A, entitled "Superfund Remedial Design and Remedial Action Guidance."

Plaintiffs will either approve the Remedial Design or require modifications and notify IMC in writing of such approval or required modifications.

Should plaintiffs require modifications to the Remedial Design for PCBs, IMC shall

have thirty days from the date of plaintiffs' written notification to make the required modifications and submit the revised Remedial Design.

Within thirty days of plaintiffs' written approval of the Remedial Design, IMC shall initiate removal and disposal of the PCB sediments under plaintiffs' oversight.

IMC shall complete the removal and disposal in accordance with the schedule set forth in the Remedial Design approved by plaintiffs.

Within thirty days of completion of the PCB component of the Work, IMC shall submit a Remedial Action Report to plaintiffs which includes a Notice of Completion that all components of the removal have been completed in accordance with the Remedial Design and the ROD.

Plaintiffs will either approve the Remedial Action Report or notify IMC in writing that modifications are required.

Should plaintiffs require modifications to the Remedial Action Report, IMC shall have fifteen days from notification to make the modifications including performing any additional work.

#### Treatability Study

Within 30 days of EPA's written approval of the Scope of Work, IMC shall issue RFPs for the Treatability Study.

Within thirty days of plaintiffs' written approval of the Scope of Work, IMC shall select a contractor to conduct the Treatability Study and submit the name to plaintiffs.

Within sixty days of plaintiffs' written approval of the Scope of Work, IMC shall submit a Treatability Work Plan to plaintiffs.

Plaintiffs will either approve the Work Plan or require modifications and notify IMC in writing of such approval or required modifications.

Should plaintiffs require modifications to the Work Plan, IMC shall have ten days from the date of plaintiffs' written notification to make the required modifications and submit the revised Work Plan.

The Work Plan shall include, but not be limited to the following elements: (i) review of existing data; (ii) sampling and analysis of groundwater; (iii) treatability process design for groundwater; (iv) conceptual design based on laboratory results; (v) reporting; (vi) schedule for completion.

The Treatability Study shall be completed in accordance with the schedule for performance set forth in the Work Plan, as approved by plaintiffs.

Within twenty days of completion of the Study, IMC shall submit a Report to plaintiffs which shall set forth the parameters of the treatment system to meet EPA's target levels for the four indicator compounds.

Plaintiffs will either approve the Report or require modifications and notify IMC of such approval or required modifications.

Should plaintiffs require modifications to the Report, IMC shall have ten days from the date of plaintiffs' written notification to make the modifications and submit the revised report.

#### Remedial Design/Remedial Action Regarding Groundwater

Within ten days of plaintiffs' approval of the Treatability Report, IMC shall issue RFPs for the groundwater extraction treatment system for the GLCC site and the marsh (hereinafter "system").

Within thirty days of plaintiffs' approval of the Treatability Report, IMC shall select a contractor to design, construct, implement, operate and maintain the system and submit the name to plaintiffs.

Within sixty days of plaintiffs' approval of the Treatability Study, IMC shall submit a Remedial Design for the system which shall include plans, specifications, schedules and other pertinent information as set forth in EPA OSWER Directive 9355.0–4A.

Plaintiffs will either approve the Remedial Design or require modifications and notify IMC in writing of such approval or required modifications.

Should plaintiffs require modification to the Remedial Design, IMC shall have ten days from the date of plaintiffs' written

notification to make the required modifications and submit the revised Remedial Design.

Within thirty days of plaintiffs' written approval of the Remedial Design, IMC shall initiate on-site remedial action for design, construction operation and maintenance of the system under plaintiffs' oversight.

IMC shall comply with the schedule for completion set forth in the Remedial Design approved by plaintiffs.

Within thirty days of completion of the groundwater pump and treat component of the remedial action, IMC shall submit a Remedial action Report to plaintiffs. The Report shall include, but not be limited to, a demonstration that the treatment goals of 5 ppb for the four indicator compounds have been met for three years at Route 125 and other monitoring wells designated by plaintiffs on the GLCC site and in the marsh.

Plaintiffs will either approve the report or require modifications and will notify IMC in writing of such approval or required modifications.

Should plaintiffs require modifications to the Report, IMC shall have the timer period specified by plaintiffs in the notification to make the modifications and perform any additional work.

### General Provisions

IMC shall submit monthly progress reports, by the tenth day of every calendar month, to plaintiffs describing the actions taken during the previous month towards compliance with this Order, results of sampling and testing analyses (including the data itself), difficulties encountered with schedules and the work anticipated to be performed in the upcoming month. IMC shall provide copies of all analytical results and field results to plaintiffs.

EPA and the State each shall, within 30 days of this order designate a project coordinator ("project coordinator") who shall be responsible for the receipt of all written matters required by this order review of documents submitted pursuant to this order and approval or disapproval of the progress of the work. The EPA project coordinator or any consultant EPA retains shall be responsible for the observation and monitoring of the work. EPA and the State shall submit the names and addresses of the project coordinator[s] in writing to IMC.

The EPA project coordinator shall have the authority vested by 40 C.F.R. Part 300, as amended. If activities conducted by IMC in implementing this order and the work cause circumstances which present or may present an imminent danger to the public health or welfare or to the environment, the EPA project coordinator shall have authority to stop activities and to direct IMC to perform the work in a manner which avoids or mitigates the endangerment and to submit a plan to the EPA project coordinator describing in detail the actions that are necessary to abate the endangerment, including a schedule according to which the actions shall be implemented. Thereafter, IMC shall implement the response plan according to the approved schedule.

### REQUESTS

A plethora of requests have been filed by the parties in this case. Some of the requests include within the alleged context of one request as many, in some instances, as three or more separate issues.

Some of the requests have been answered in the court's memorandum opinion, some candidly have been ignored, others in view of the court's ultimate findings may be moot. Rule 52 Fed.R.Civ.P. Findings should represent the judge's own determination and not the long, often argumentative, statements of successful counsel. *United States v. Forness*, 125 F.2d 928 (2d Cir.1942) *cert. denied*, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764. See *Concord General Mutual Insurance Co. v. Haynes*, 110 N.H. 76, 260 A.2d 99 (1969); *Fortier v. Olin Corporation*, 840 F.2d 98, 99 (1st Cir. Feb. 18, 1988). The court's duty is to "find the facts specially and state separately its conclusions of law thereon." Fed.R.Civ.P. 52(a).

CONCLUSION

More filings have been made since the last hearing and the court has endeavored to respond to most of them.

IMC has indicated that it intends to appeal the court's order pertaining to groundwater. The plaintiffs are equally unhappy. Outside of the fencing proposal, nothing of a remedial nature is being done.

The case is ripe for appeal and some finality has to be obtained.